Filed 5/12/14  In re E.T. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re E.T., a Person Coming Under the Juvenile Court Law. | B251392 |
| | (Los Angeles County Super. Ct. No. CK43740) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MICHELE O. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Tony L. Richardson, Judge.  Affirmed.

Grace Clark, under appointment by the Court of Appeal, for Defendant and Appellant, Michele O.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant, G.T.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

Michele O.,[1] the mother of three-year-old E.T., appeals from the juvenile court's September 10, 2013 order terminating her parental rights. Michele contends the court erred in concluding she had not established the parent-child beneficial relationship exception to the termination of parental rights provided by Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[2] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Section 300 Petition*

On April 15, 2011 the Los Angeles County Department of Children and Family Services (Department) filed a dependency petition pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect) and (j) (abuse of sibling), alleging E.T., then three months old, was at substantial risk of suffering serious physical harm based on Michele's recent and past physical abuse of E.T.'s sisters R.W. (then five years old) and M.O. (then three years old), who were already dependents of the juvenile court due to Michele's physical abuse of M.O.[3] The petition further alleged Michele had a history of substance abuse that rendered her unable to provide regular care and supervision of E.T. and also alleged E.T.'s other siblings, A.S. and L.W., had previously been removed from Michele's custody and were receiving permanent placement services. (A.S. and L.W. had been declared dependents of the juvenile court in 2000 as a result of Michele's physical abuse. Michele failed to reunify with the two children; and they were residing with their maternal grandmother, who was now their legal guardian.) Finally, the petition alleged E.T.'s father, G.T., had a history of illicit drug abuse that rendered him unable to provide regular care and supervision of the child. In an amended petition filed May 19, 2011 the Department added the allegation that G.T. had been diagnosed

---

[1]     The mother's name is spelled Michelle, rather than Michele, at various points in the record. For consistency we spell it Michele throughout this opinion.

[2]     Statutory references are to the Welfare and Institutions Code.

[3]     A supplemental petition pursuant to section 387 was filed on behalf of R.W. and M.O. concurrently with the section 300 petition as to E.T.

2

with bipolar and attention deficit hyperactivity disorders (ADHD) and was currently in a residential program for high functioning individuals with mental and emotional health problems.

At the detention hearing on April 15, 2011 the court found the Department had established a prima facie case E.T. was a child described by section 300, removed her from Michele's custody and temporarily placed her under the custody and care of the Department. Michele was permitted monitored visits four days per week for two hours each day. G.T. was found to be E.T.'s presumed father and granted unmonitored visitation four times per week for two hours each visit. On July 7, 2011 E.T. was placed with her paternal great aunt Yvonne J.[4]

2. *The Jurisdiction and Disposition Hearing*

Following a contested jurisdiction hearing on August 25, 2011 at which both Michele and the social worker testified, the court sustained in part the amended petition, which had been further amended by interlineation. Specifically as to Michele, the court sustained revised subdivision (b) allegations that Michele had failed to adequately supervise the children, resulting in R.W. sustaining injuries. That failure to supervise placed all her children at risk of physical harm. For his part, G.T. pleaded no contest to the amended petition; and the court sustained the amended allegations he had been diagnosed with bipolar disorder and ADHD and was living in a residential facility that did not allow children, thereby limiting his ability to provide E.T. directly with necessary care, supervision and protection. The counts alleged pursuant to section 300, subdivisions (a) and (j), were dismissed.

The court ordered that E.T. remain suitably placed with reunification services for both Michele and G.T., including counseling, interactive parenting and a mental health evaluation for Michele. Michele was permitted up to nine hours of monitored visitation per week. G.T. was authorized to have unmonitored visitation with E.T.

---

[4] The paternal aunt's name is spelled Evonne, rather than Yvonne, at various points in the record.

3

3. *Subsequent Review and Modification Hearings*

In a status review report prepared for the February 24, 2012 six-month review hearing (§ 366.21, subd. (e)), the Department stated E.T. continued to reside with Yvonne, who provided her with all the necessities of life including emotional support. According to the report, Yvonne stated she was willing to commit to adoption if Michele and G.T. failed to reunify with E.T. The Department also reported Michele was only in partial compliance with her monitored visitation. Yvonne had been monitoring the visits, but in early November 2011 Michele called Yvonne and threatened to kill her. The monitored visits were thereafter held at one of the Department's offices.

The six-month review hearing was continued twice and ultimately held on June 12, 2012. After hearing testimony from both Michele and G.T. and considering several reports from the Department, the court found Michele was not in compliance with her case plan and terminated reunification services as to her. G.T.'s visitation was modified to monitored, but reunification services were otherwise extended as to him.

The 12-month review hearing (§ 366.21, subd. (f)), originally scheduled for December 11, 2012, was continued to January 23, 2013 for a contest by G.T. The day prior to that hearing, January 22, 2013, Michele filed a petition for modification of prior orders (§ 388) requesting that the court reinstate her reunification services and permit her to have unmonitored and overnight visits with E.T. The petition alleged Michele had been participating in various programs and had maintained continued contact with E.T.

On January 23, 2013 the court terminated reunification services as to G.T., identified permanent placement with Yvonne as the permanent plan for E.T.,[5] and set a selection and implementation hearing (§ 366.26) for May 22, 2013. The court also ordered the Department to prepare a response to Michele's petition, set an interim hearing date of February 20, 2013, and then scheduled the contested hearing for May 8, 2013.

---

[5] The court apparently considered the January 23, 2013 hearing to be a combined proceeding under section 366.21, subdivision (f), and section 366.22, although the record is not entirely clear on this point.

4

In response to Michele's petition the Department reported Michele had been attending Narcotics Anonymous meetings and participating in other programs, but was not in full compliance with her mental health treatment. Michele had been inconsistent in her weekly visits with E.T. In addition, the social worker and other Department staff observed E.T. did not appear to be bonded with Michele: Although E.T. called Michele "Mommy," it took her at least 30 minutes to warm up and interact with Michele during visits; and the young child did not appear sad when the visits concluded. In fact, during the March 1, 2013 visit E.T. said "no, no, no" when she saw Michele and rejected Michele's attempts to hug her. At the hearing on May 8, 2013, after Michele testified and the court heard argument, the court denied the petition, finding the best interest of E.T. would not be promoted by the proposed change of order.

4. *The Selection and Implementation Hearing*

For the continued selection and implementation hearing on September 10, 2013, the Department submitted a report describing in considerable detail Yvonne's background and experience and the "close and loving relationship" she had developed with E.T. The Department explained Yvonne had completed all the necessary paperwork and her adoption home study had been approved. The Department recommended Michele's and G.T.'s parental rights be terminated and the juvenile court proceed with the finalization of E.T.'s adoption.

Michele testified at the hearing and briefly described her twice weekly, monitored visits with E.T. and explained she had no contact with Yvonne, who is G.T.'s relative, not hers. She also testified her other children asked about E.T. and wanted to see her.

In arguing against terminating parental rights, however, Michele's counsel only mentioned the parent-child beneficial relationship exception in passing, limiting her comments on this point to the following four sentences: "My client has visited regularly with her child, consistently with her child since the time of detention. She currently goes two times a week for these [visits], two hours every visit, which doesn't seem like a lot, but it's four hours that [E.T.] is used to having with her mother every week. . . . Whether

5

or not an exception would exist here, Your Honor would have to find that she does fit into that parental role of a [section 366.26, subdivision] (c)(1)(B)(i) exception, and I would assert that is a difficult burden to meet . . . ." Instead, observing that E.T. had siblings who would like to keep a relationship with her and emphasizing that the Yvonne was not maintaining contact with Michele, her counsel urged the court to appoint Yvonne as E.T.'s legal guardian: "This child is with a relative. [She's] a relative of the father's. I know that the caretaker is committed to adopting this child and would be willing to, but I would just ask that Your Honor look at what would be best for this child [E.T.], and I believe that mother has consistently shown up to court. She has consistently put forward her efforts that she has made for not only this child, but her other children. Her other children unfortunately were not returned to her. They were put into a guardianship, thank God, because she has a relationship with those. That's what she's asking of this court today, Your Honor, that you allow her to continue to have a relationship with this child and that [E.T.] be put into a guardianship rather than an adoption, and that is our request."

Counsel for E.T. asked the court to terminate parental rights and to permit E.T. to achieve permanency in her placement through adoption: "[E.T.] is about to be three, and this case has been open for more than two years. It's in her best interest that she has permanency in her life, and right now she has the option of permanency with her relative who is willing and who is approved to adopt her." The Department's counsel argued no evidence had been presented that would justify any permanent plan other than adoption and pointed out its report indicated Yvonne was willing to maintain visitation with E.T.'s birth parents as long as it was not detrimental to her physical or emotional well-being. Michele's counsel asked the court, if it was still inclined to terminate parental rights, that it defer the order until something more formal regarding post-adoption visitation could be developed.

The court found by clear and convincing evidence E.T. was adoptable and no exception to adoption applied, and terminated Michele's and G.T.'s parental rights. The court explained, "It seems clear to me that this prospective adoptive parent is very

6

interested in adoption and not legal guardianship. . . . Having said that, I accept, given mother's visits and putting aside the longer history here, but certainly part of this history is mother's visits[, it] appears to me mother does want to maintain some contact with the child. I know in the report there's some suggestion that mother is not well-bonded with this child. That may very well be the case. The child is two, and I think to some extent it is really difficult to determine what are the parameters of such bonds at that age. Be that as it may, I do accept that mother has an interest and has shown an interest in maintaining [contact] with this child. Therefore, I am inclined to strongly recommend and order that there be a referral to the consortium . . . for the purpose of there being some determination as to assuming the adoption goes through with this child . . . the adoptive parent being able to facilitate visits for mother going forward."

Michele filed a timely notice of appeal.[6]

## DISCUSSION

1. *Governing Law*

Section 366.26 governs the juvenile court's selection and implementation of a permanent placement plan for a dependent child. The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) Once the court has decided to end parent-child reunification services, the legislative preference is for adoption. (§ 366.26, subd. (b)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["[I]f the child is adoptable . . . adoption is the norm. Indeed, the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child."]; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [once reunification efforts have been found

---

[6] G.T. also filed a notice of appeal following the juvenile court's September 10, 2013 order terminating parental rights. However, his appointed counsel filed a brief that raised no issues, and G.T. submitted no additional letter identifying any contentions he wished to raise on appeal. Accordingly, his appeal is dismissed as abandoned pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835 and *In re Sade C.* (1996) 13 Cal.4th 952.

7

unsuccessful, the state has a "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody" and the court then must "concentrate its efforts . . . on the child's placement and well-being, rather than on a parent's challenge to a custody order"].)

Section 366.26 requires the juvenile court to conduct a two-part inquiry at the selection and implementation hearing. First, it determines whether there is clear and convincing evidence the child is likely to be adopted within a reasonable time. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250; *In re D.M.* (2012) 205 Cal.App.4th 283, 290.) Then, if the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of the enumerated statutory exceptions applies. (§ 366.26, subd. (c)(1)(A) & (B); see *In re Matthew C.* (1993) 6 Cal.4th 386, 392 [when child adoptable and declining to apply one of the statutory exceptions would not cause detriment to the child, the decision to terminate parental rights is relatively automatic].)

One of the statutory exceptions to termination is contained in section 366.26, subdivision (c)(1)(B)(i), which permits the court to order some other permanent plan if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The "benefit" prong of the exception requires the parent to prove his or her relationship with the child ""'"promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."'"" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643; accord, *In re Amber M.* (2002) 103 Cal.App.4th 681, 689; see *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer"].)

A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption. (See *In re Angel B.* (2002)

97 Cal.App.4th 454, 466 ["[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent"].) No matter how loving and frequent the contact, and notwithstanding the existence of an "'emotional bond'" with the child, "'the parents must show that they occupy "a parental role" in the child's life.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) Factors to consider include "'the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*In re Marcelo B.*, *supra,* 209 Cal.App.4th at p. 643.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; accord, *In re C.B.* (2010) 190 Cal.App.4th 102, 122; see *In re Celine R.*, *supra,* 31 Cal.4th at p. 53 ["[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation] to choose an option other than the norm, which remains adoption"].)

2. *Standard of Review*

The parent has the burden of proving the statutory exception applies. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) The court's decision a parent has not satisfied this burden may be based on either or both of two component determinations— whether a beneficial parental relationship exists and whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); see *In re K.P., supra*, 203 Cal.App.4th at p. 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) When the juvenile court finds the parent has not established the existence of the requisite beneficial relationship, our review is limited to determining whether the evidence compels a finding in favor of the parent on this issue as a matter of law. (See *In re I.W.*

9

(2009) 180 Cal.App.4th 1517, 1527-1528.)[7] When the juvenile court concludes the benefit to the child derived from preserving parental rights is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption, we review that determination for abuse of discretion. (*In re K.P.*, at pp. 621-622; *In re Bailey J.,* at pp. 1314-1315.)

### 3. *Michele Failed To Establish the (c)(1)(B)(i) Exception to Termination of Parental Rights*

Michele contends she demonstrated consistent visitation and a strong bond with E.T., satisfying the first component of the beneficial relationship exception, and her relationship with E.T. outweighed the benefits E.T. would achieve by the permanency of adoption, thus establishing a compelling reason for determining that termination of parental rights would be detrimental to the child. The juvenile court did not expressly rule on the first element of this exception, observing that Michele had visited E.T. throughout her placement and was interested in maintaining contact, but also acknowledging that the Department might well be right that Michele and E.T. were not well-bonded. The absence of a finding on this point is not surprising, given the tactical decision by Michele's counsel not to urge the court to find the beneficial relationship exception applied but instead to request it utilize its authority under section 366.26, subdivision (b)(3), to appoint a relative with whom the child was currently residing as legal guardian—an option the court rejected in a ruling not challenged by Michele.

---

[7] Because the juvenile court's factual determinations are generally reviewed for substantial evidence, it has often been posited a challenge to a finding that no beneficial relationship exists is similarly reviewed for substantial evidence. (See, e.g., *In re Bailey J., supra,* 189 Cal.App.4th at p. 1314; *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) The parent's failure to carry his or her burden of proof on this point, however, is properly reviewed, as in all failure-of-proof cases, for whether the evidence compels a finding in favor of the appellant as a matter of law. (See *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 ["where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"]; *In re I.W., supra,* 180 Cal.App.4th at pp. 1527-1528 [same].)

Nonetheless, the evidence of Michele's "regular visitation and contact with the child" was, at best, equivocal. Michele visited E.T. only once in the initial month following her detention (when E.T. was four months old). During the next two years Michele visited E.T. on average only once per week, not taking full advantage of the opportunities given for visitation under the applicable court orders (up to nine hours per week). When the court allowed three visits per week starting in May 2013, Michele began visiting twice each week, yet again not exercising her full right to visitation.

Even assuming Michele could establish her visits with E.T. were minimally sufficient to require a comparison of the relative benefit of continuing that relationship with the permanence and stability of adoption by Yvonne, the juvenile court acted well within its discretion in concluding it would not be detrimental to E.T. to terminate Michele's parental rights. Absent extraordinary circumstances not present here, supervised visitation alone does not create the opportunity for a mother or father to assume a parental role in the child's life and is thus insufficient to outweigh the statutory preference for adoption. (See *In re K.P., supra,* 203 Cal.App.4th at p. 621 ["[t]he relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences'"]; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51 [while day-to-day contact is not required, it is difficult to demonstrate a beneficial parent/child relationship when visits remain monitored]; *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109 [parent's failure to progress beyond monitored visitation with a child and to fulfill a "meaningful and significant parental role" justifies order terminating parental rights].) Moreover, there was no evidence termination of Michele's rights would deprive E.T. "of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed" (*In re Angel B., supra,* 97 Cal.App.4th at p. 466 [italics in original].) To the contrary, a number of the Department's reports regarding the monitored visits between Michele and E.T. prior to July 2013 described E.T. as hesitant, or even reluctant, to interact with

11

Michele, and thereafter portrayed what can generously be called visits with a friendly relative, certainly not a strong parental bond.

In contrast, E.T. had been living with Yvonne for more than two years (since she was seven months old). Yvonne, fully committed to adopting E.T. and with an approved adoption home study, provided the child with a safe, loving environment. E.T. was thriving in her placement. The court was amply justified in concluding it was in E.T.'s best interest to make it her permanent home through adoption.

## DISPOSITION

G.T.'s appeal is dismissed as abandoned. As to Michele O., the juvenile court's order is affirmed.


PERLUSS, P. J.

We concur:


WOODS, J.


ZELON, J.

12