Filed 8/25/14  In re B.B. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re B.B., a Person Coming Under the Juvenile Court Law. | B253549 (Los Angeles County Super. Ct. No. CK53151) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSE G., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Tony L. Richardson, Judge.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and John C. Savittieri, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Jose G. appeals from the juvenile court's order terminating his parental rights over his daughter B.B., following a hearing pursuant to Welfare and Institutions Code section 366.26.[1] He challenges the juvenile court's determination that the parent-child relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) did not apply. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Jose G. and Elsa B.[2] are the parents of B.B. They are not married. When Elsa B. was one month pregnant with B.B., Jose G., who has an extensive criminal record, was imprisoned for the commission of a felony.

Elsa B. is no stranger to the juvenile dependency system. Her five older children received permanent placement services after the juvenile court removed them from her custody for various reasons, including physical abuse, neglect, and substance abuse.[3] Because of Elsa B.'s extensive and ongoing history with the dependency system, the Department of Children and Family Services (Department) called her after the birth of B.B. to assess the safety and welfare of the newborn. When Elsa B. failed to return the Department's calls, the Department generated a referral of general neglect. The children's social worker made a safety plan with Elsa B. to ensure that Elsa B. would meet B.B.'s needs.

---

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     Elsa B. is not a party to this appeal.

[3]     Jose G. is not the father of these children.

Jose G. was paroled from state prison when B.B. was one month old, and he and Elsa B. reunited. Jose G. often stayed at Elsa B.'s home and provided supplies for B.B.'s care.

In January 2010 Elsa B. tested positive for methamphetamine.[4] This fact, together with her history of substance abuse and inability to care for her other children, led the Department to conclude that B.B. was not safe with her mother. As a result, the Department took B.B., who was then four months old, into protective custody, placed her in foster care, and commenced dependency proceedings on her behalf.

In its January 11, 2011 petition the Department alleged that B.B. was a dependent child within the meaning of section 300, subdivisions (b), (g), and (j). Specifically, the Department alleged that Elsa B.'s seven-year history of illicit drug and alcohol abuse endangered B.B. (counts b-1 & j-1), that Elsa B. further endangered B.B. by allowing her maternal aunt, who also has a substance abuse problem, to have access to B.B. (count b-2), and that Jose G. failed to provide B.B. with the necessities of life (counts b-3 & g-1). On February 7, 2011 the juvenile court dismissed the original petition, and the Department filed a first amended petition adding the additional allegation that Jose G. had a history of substance abuse that endangered B.B. (count b-4).

In its jurisdiction/disposition report, the Department recommended that the court not order family reunification services for Elsa B. pursuant to section 361.5, subdivision (b)(10) and (11), because she had failed to reunify with her other children and had not accepted responsibility for her current or past conduct despite having participated in services designed to address her substance abuse and failure to protect her children. With respect to Jose G., the Department expressed its concern about the length and severity of his criminal history. Although most of Jose G.'s contacts with law enforcement occurred before B.B. was born, the Department wanted him "to

---

[4] Elsa B. denied she used methamphetamine, claiming that she was unaware that someone had put it in her drink at a New Year's party. She stated, "my drug of choice is not even Meth its [*sic*] alcohol."

demonstrate, over time, that he is willing and able to become a law-abiding citizen." The Department therefore recommended that Jose G. receive family reunification services.

At the March 7, 2011 adjudication hearing the juvenile court sustained counts b-1 and b-2 of the first amended petition. The court dismissed counts g-1 and j-1 in the interest of justice, and struck counts b-3 and b-4 pertaining to Jose G., leaving Jose G. a nonoffending parent. The court declared B.B. a dependent child under subdivision (b) of section 300, ordered family reunification services for Jose G. only, and placed B.B. in his home under supervision of the Department. The court-ordered disposition case plan specified that Jose G. was to attend parent education and submit to monthly random drug tests.

On June 14, 2011 Jose G. was arrested for domestic violence against Elsa B., and he subsequently was convicted of assault and possession of narcotics. On June 20, 2011 the Department removed B.B. from Jose G. On June 23, 2011 the Department filed a supplemental petition pursuant to section 387, alleging in count s-1 that Jose G. had been incarcerated on June 14, 2011 and had endangered B.B. by "fail[ing] to make an appropriate plan for the child's ongoing care and supervision . . . ." Jose G. had left B.B. in the care of her paternal grandmother, who did not have the financial means to provide for B.B. The Department placed B.B. back with her original foster mother. On August 3, 2011 the Department filed a first amended supplemental dependency petition that added the allegation that on June 14, 2011, and on prior occasions, Jose G. and Elsa B. engaged in altercations (count b-1).

Jose G. waived his rights and pleaded no contest to the amended section 387 petition. The juvenile court sustained both counts as amended and ordered the Department to continue the original case plan as amended to provide that Jose G. also complete domestic violence counseling.

A status review report prepared by the Department on February 9, 2012 for the six-month review hearing (§ 366.21, subd. (e)) revealed that Elsa B. again was pregnant with Jose G.'s child, and that she was due at the end of the month. Jose G. was still in state prison. He was not in compliance with his case plan because the prison did not offer

4

his court-ordered programs, and he had not seen B.B. He had written to the social worker, however, to express his desire to reunite with B.B. once he was released from prison. B.B., now 18 months old, was healthy and thriving in her current placement. She was well-adjusted and meeting all of her developmental milestones. The Department recommended termination of Jose G.'s family reunification services and that the court set a hearing pursuant to section 366.26.

Jose G. was released from prison on February 13, 2012. He was required to drug test and register as a gang and narcotics offender.

At the February 14, 2012 six-month review hearing the court ordered the social worker to meet with Jose G., set up a visitation schedule, and provide him with a list of referrals. The court also ordered Jose G. to submit to drug testing.

On February 16, 2012 the social worker met with Jose G. and set up a visitation schedule. During another visit the next week the social worker reminded Jose G. that he had to tell the Department when his son was born. Jose G. acknowledged this requirement, but did not tell the social worker that his son, Romeo G., had already been born that month. Jose G. became defensive when B.B.'s foster mother told Jose G. to tell the social worker he had a newborn son. The social worker subsequently called Elsa B., who admitted that she recently had given birth. Elsa B. did not want the Department to take her son from her, so she did not provide much information.

On June 4, 2012 B.B. was placed, together with Romeo G., in the foster home of Mr. G. and Mr. R.[5] Although B.B.'s original foster mother had expressed an interest in adopting B.B., she was no longer able to care for or adopt B.B. because she had to care for her elderly mother.

By the time of the 12-month permanency planning hearing (§ 366.21, subd. (f)) on October 2, 2012, B.B. was two years old and doing well in her new foster home. Mr. G.

---

[5] Mr. G. and Mr. R. are occasionally referred to in the appellate record as Mr. M. and Mr. D.

was interested in adopting B.B. and Romeo if they did not reunify with their parents. The foster parents already had an approved adoption home study.

Meanwhile, Elsa B. was pregnant again. Jose G. was attending a domestic violence program and visiting B.B. weekly, together with Elsa B. When the social worker asked Jose G. in September whether he and Elsa B. were expecting a third child, Jose G. became defensive, stating he did not want the Department to take away another child. The social worker explained that the Department would have to assess the newborn just as it had assessed B.B. and Romeo.

Although Jose G. had attended a few parenting classes, he was not currently enrolled in or attending a parent education program. His drug tests had been negative, but he could not submit to weekly testing because he did not always have access to a phone in order to learn the date of his random test. Jose G. continued to visit B.B. with Elsa B. The visits were monitored by a social worker. Both parents acted appropriately. The Department reported that because Jose G. was continuing his relationship with Elsa B., it was in B.B.'s best interest that the visits remain monitored in order to prevent the parents from having a physical altercation such as the one that led to Jose G.'s last arrest. Because Jose G. had failed to complete a parenting course in the six months since his release from prison, and because of the length of time needed to complete a domestic violence program, the Department again recommended that the juvenile court terminate Jose G.'s family reunification services and that the court continue the matter 120 days for a hearing on the selection and implementation of a permanent plan.

At the 12-month review hearing the juvenile court ordered Jose G. to complete a 26-week domestic violence class and gave the Department discretion to liberalize his visits. The court found that Jose G. was in compliance with his case plan.

During the ensuing period of supervision Elsa B. filed a police report against Jose G. alleging domestic violence. Jose G. denied hitting Elsa B. Although both parents were appropriate during their visits with B.B., they were "very inconsistent with their scheduled visitation" and "missed many visits." On one occasion, however, Jose G. showed up for a visit without first calling to confirm. When the monitor explained that

6

he could not visit with B.B. because he had not called in advance, Jose G. started "moving his fingers around and looking down in an angry manner . . . ." The monitor saw Jose G. "make a fist with his left hand" and became "intimidated and frightened by" Jose G.'s behavior. Although she "was unnerved," she allowed the visit because "she feared his hostile reaction." Because Jose G. "has not demonstrated positive lifestyle changes and the issues that brought this case to the attention of [the Department] have not been resolved," the Department recommended again that the court terminate Jose G.'s reunification services.[6]

At the 18-month review hearing (§ 366.22) on February 6, 2013, Jose G. asked that the court set the matter for a contest. On the continued hearing date, May 1, 2013, the juvenile court found that Jose G. was not in compliance with the case plan, terminated his reunification services, and scheduled a section 366.26 hearing.

In its report for the section 366.26 hearing, the Department stated that Elsa B.'s whereabouts were unknown, and that both parents "have regularly scheduled monitored visitation once a week on Friday from 9:30-10:30 am with" B.B. and Romeo. The visits were monitored by a foster care social worker. The report stated that Jose G. and Elsa B. "are very inconsistent with their scheduled visitation and have missed many visits. The child, [B.B.] does not have a parent-child bond with either birth parent." According to the caregiver, Jose G.'s visitation was "sporadic" prior to May 1, 2013, when the juvenile court terminated his family reunification services. Since that time, Jose G. had visited more regularly but missed three or four visits.

The Department further reported that B.B. calls her father "Jose." She only called him "Papa" when Jose G. asked and reminded her to do so. In addition, the report stated that "[B.B.]'s reaction to birth mother and birth father is indifferent. [B.B.] does not become upset when visits are over. [B.B.] does not ask for her mother or father in-between visits. [B.B.] is reported to act out on the day of the visit. If the visit is

---

**6** The Department also reminded the court that it had previously terminated Jose G.'s family reunification services for Romeo.

cancelled, then [B.B.] is fine that day. During the visit, on 8/9/13, [B.B.] was defiant with her father. [B.B.] did not follow father's direction to pick up the toys and said 'No!' to father. [B.B] is not familiar with father as a parent figure. [B.B] perceives the weekly visit as a play date and an opportunity to see [the social worker who monitors the visits]. [B.B.] does not have an emotional attachment to birth parents. Parents occasionally bring a toy, Sippy cup, candy or sweets to the visit. Items are not brought consistently. Mother has missed many visits, as her attendance has declined significantly since May 2013." The Department recommended that the court select adoption as B.B.'s proposed permanent plan and terminate the parental rights of Jose G. and Elsa B.

On August 28, 2013 counsel for Jose G. asked the court to set the matter for a contested section 366.26 hearing. Counsel for Elsa B. joined in the request. In anticipation that the parents would claim that the parent-child relationship exception precluded termination of parental rights, the court ordered an updated report on the parents' visitation with B.B. and continued the matter to December 3, 2013.

In a subsequent status review report, the Department stated that, according to the foster family agency social worker who monitored the parents' visits with B.B., Jose G. was "inconsistent" in his visits with B.B. and Elsa B. had not visited since August. The social worker observed that B.B. "does not recognize her biological parents as 'parent figures,' nor does [the] child appear attached or bonded to parents." In its supplemental report prepared for the December 3, 2013 hearing the Department again stated that Jose G. and Elsa B. had the opportunity to participate in monitored visits with B.B. every Friday morning. Since the August 28, 2013 review hearing, Jose G. had missed two visits and Elsa B. had missed all visits except one. Elsa B.'s whereabouts were still unknown, and she had not responded to calls from the Department.

The Department again reported that B.B. "does not have a parent-child bond with her birth father. [B.B.] does not cry when visitation is over. [B.B.] perceives the visit as a play date. It does not appear to matter to [B.B.] if the parents miss a visit. [B.B.] perceives her caregivers, Mr. G. and Mr. R., as her parents." B.B. "continued to do well in the home of Mr. G. and Mr. R." since her placement with them. "The caregivers are

8

committed to providing the child, [B.B.], and her sibling, Romeo, with a permanent and stable home through adoption. The child, [B.B.], is deemed as highly adoptable, as the child is young, healthy and residing with caregivers that are willing to adopt. The mother, Elsa B[.], and father, Jose G[.], have not assumed a parental role; therefore, visitation does not appear to be a barrier to adoption. The Department believes that adoption is in the best interest of the child and therefore recommends that parental rights be terminated and that the child be declared legally freed so that the child, [B.B.], could be adopted."

At the section 366.26 hearing Jose G. testified that he visited B.B. every Friday for one hour. He acknowledged that he missed about six visits during the past year because of work and transportation issues. He described his visits with B.B. and acknowledged that he could only do so much in an hour. Jose G. did not want the court to terminate his parental rights. He asked the court to "give [him] a chance . . . ." He asked for longer visits stating, "Maybe I get to bond with her and entertain [*sic*] maybe she'll get to know — I mean, . . . she knows I'm her father, but she's — most of the time she's with the caretaker . . . and all them who are taking care of her." Counsel for Jose G. and counsel for Elsa B. asked the court not to terminate parental rights. Counsel for Elsa B. acknowledged, however, that section 366.26, subdivision (c)(1)(B)(i), "requires more than just a friendly visitor." Counsel for B.B., on the other hand, asked the court to free B.B. for adoption. Counsel argued that B.B. was adoptable and that Jose G. had not established either prong of the parent-child relationship exception.

At the conclusion of the hearing, the court found by clear and convincing evidence that B.B. was adoptable and that the parent-child relationship exception was inapplicable. The court stated, "And I guess the expression that I heard today is that of a friendly visitor, and it does appear from what I've gleaned from the record and what I've heard from father that his relationship with the now three-year-old child is more of that as opposed to father having assumed a parental role." The court recognized Jose G.'s efforts but noted "there's not enough." The court concluded that Jose G. had failed to meet his burden of establishing the parent-child relationship exception, and selected

9

adoption as the permanent plan for B.B. Therefore, the court terminated the parental rights of Jose G. and Elsa B. over B.B. and placed B.B. in the care, custody, and control of the Department for adoptive planning and placement. Jose G. timely appealed.

## DISCUSSION

At a selection and implementation hearing pursuant to section 366.26, the juvenile court must select a permanent plan for the dependent child. (*In re I.R.* (2014) 226 Cal.App.4th 201, 210; *In re G.C.* (2013) 216 Cal.App.4th 1391, 1397.) Adoption is strongly preferred over other alternatives, such as legal guardianship and long-term foster care. (§ 366.26, subds. (c)(1), (c)(4)(A); *In re Michael G.* (2012) 203 Cal.App.4th 580, 588.) Once the juvenile court has determined that the child is adoptable, the court must terminate parental rights and select adoption as the permanent plan unless it "finds a compelling reason for determining that termination would be detrimental to the child" under one of the exceptions listed in section 366.26, subdivision (c)(1)(B). The exception relevant here is the parent-child relationship exception. Under this exception, the parent has the burden of proving by a preponderance of evidence that termination of parental rights would be detrimental because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

"Regular visitation exists where the parents visit consistently and to the extent permitted by court orders." (*In re I.R.*, *supra*, 226 Cal.App.4th at p. 212.) "'Sporadic visitation is insufficient to satisfy the first prong . . . ' of the exception. [Citation.]" (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 643.)

"The benefit to the child must promote 'the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense

10

of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.] Even frequent and loving contact is not sufficient to establish this benefit absent a significant, positive emotional attachment between parent and child. [Citations.]" (*In re I.R.*, *supra*, 226 Cal.App.4th at pp. 212-213; see *In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 643.) Therefore "the parent must . . . be more to the child than a mere 'friendly visitor or friendly nonparent relative.'" (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.) "'Interaction between [a] natural parent and child will always confer some incidental benefit to the child.'" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) However, "a *parental* relationship is necessary for the exception to apply . . . ." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) "'Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent.' [Citation.]" (*In re C.F.*, *supra*, at p. 557.)

The juvenile court may conclude that the parent-child relationship exception to adoption does not apply either because (1) the parent failed to maintain regular visitation and contact with the child and the child would not benefit from continuing the relationship (a factual finding), or (2) an existing parent-child relationship does not constitute "a compelling reason for determining that termination would be detrimental to the child " (a discretionary determination). (§ 366.26, subd. (c)(1)(B); see *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) When reviewing the juvenile court's determination that the parent-child relationship exception to adoption does not apply, we apply a composite standard of review. (*In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621-622.) With regard to the court's factual findings, the applicable standard of review depends on whether or not the parent sustained his or her burden of proof on a particular issue. When, as here, the juvenile court determines that a parent has not satisfied his or her burden of proof, "'it is misleading to characterize the failure-of-proof issue as whether substantial evidence

11

supports the judgment.'" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.) In this situation, because the parent has the burden of proof, we review a finding that he or she has failed to satisfy the burden as we do in failure-of-proof cases: we decide whether, as a matter of law, the evidence compels a finding favorable to the parent. (See *In re I.W.* (2009)180 Cal.App.4th 1517, 1528 ["where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"].) If the juvenile court determines that a parent has satisfied his or her burden, we apply the substantial evidence standard of review. (See *In re K.P.*, *supra*, 203 Cal.App.4th at p. 622.) Finally, if the court in the exercise of its discretion concludes there is a parent-child relationship but that the benefit to the child is not sufficiently compelling to outweigh the benefit of adoption, we apply an abuse of discretion standard of review. (*In re K.P.*, *supra*, at p. 622; *In re Bailey J.*, *supra*, at p. 1315.)

Jose G. correctly notes that "the juvenile court did not specifically find whether Father met the first prong by maintaining regular visitation with [B.B.]." The evidence relevant to the visitation prong, however, shows that during the history of this case Jose G. did not consistently visit with B.B. He missed numerous visits during the reunification period. Although he started visiting more regularly after the court terminated his reunification services, the social worker monitoring visitation with B.B. still noted that, during the period of supervision following the 18-month review hearing, "father Jose G[.] has attended visits on an inconsistent basis" and does not call to inquire about B.B.'s wellbeing.

In any event, even assuming that Jose G. had met his burden of establishing the regular visitation prong of parent-child relationship exception, the juvenile court found, with respect to the benefit prong of the exception, that "[a] parental role hasn't been established." Jose G. was in state prison when B.B. was born. Following his release he lived in different places and only saw B.B. when he stayed with Elsa B. The juvenile court detained B.B. in foster care when she was four months old. After the disposition hearing, when B.B. was seven months old, the court placed B.B. with Jose G. The court

12

again detained B.B. a few months later when Jose G. was arrested for assaulting Elsa B. and possessing of methamphetamine. Jose G. was convicted and incarcerated for nine months. During his time in prison, Jose G. did not see B.B.

At the time of Jose G.'s release B.B. was 18 months old. B.B. remained in foster care until she was freed for adoption. Despite receiving reunification services from August 2011 to May 2013, Jose G. was unable to regain custody of B.B. or have unmonitored visits with her.

At the time of the section 366.26 hearing, B.B. was more than three years old. The Department's reports disclosed that B.B. did not have an emotional attachment to or parental bond with Jose G., was indifferent to him, and did not cry when their visits ended. She called her father "Jose" and only called him "Papa" at his urging. In the Department's view, B.B. perceived her visits with Jose G. as a play date. In fact, B.B. was more excited to see the social worker who monitored the visits than Jose G. This evidence supports the juvenile court's apt characterization of Jose G. as a "friendly visitor." Because the evidence does not compel a finding in favor of Jose G. as a matter of law, we have no basis for disturbing the trial court's finding that Jose G. failed to meet his burden of establishing that he and B.B. had a parent-child relationship. (*In re I.W.*, *supra*, 180 Cal.App.4th at pp. 1527-1528.)

Finally, the trial court did not abuse its discretion in finding that termination of Jose G.'s parental rights would not be detrimental to B.B. (*In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621-622; *In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) B.B. had been living with Mr. G. and Mr. R. for 18 months, a little less than half of her life, at the time of the section 366.26 hearing. The caregivers wanted to adopt B.B., as well as her younger brother Romeo, and their adoption home study had been approved. B.B. was thriving in their home, and she "share[d] a strong bond with them." The court acted well within its discretion in concluding that B.B. was entitled to permanency in their home through adoption.

13

**DISPOSITION**

The order is affirmed.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14