Filed 2/11/15  In re K. G. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re K. G., A Person Coming Under the Juvenile Court Law. | B257113 |
| | (Los Angeles County Super. Ct. No. CK95332) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. KRISTEN M. and SALVADOR G., Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Defendant and Appellant Kristen M.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant Salvador G.

Michele Anne Cella, under appointment by the Court of Appeal, for Minor and Appellant K. G.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Tyson B. Nelson, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Minor K. G. and her parents, Kristen M. (Mother) and Salvador G. (Father), appeal from the juvenile court's orders denying the parents' petitions for modification under Welfare and Institutions Code[1] section 388 and terminating parental rights over K. under section 366.26. They contend that the juvenile court abused its discretion in denying the section 388 petitions because the parents demonstrated that their request for reinstatement of their family reunification services was supported by a change in circumstances and the best interests of K. Mother and Father also claim that the juvenile court erred in failing to apply the beneficial parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)) to the termination of their parental rights. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Section 300 Petition for K.

Mother and Father are the parents of two children—K. (born March 2012) and Kimberly (born August 2013).[2] As a minor, Mother was a dependent of the juvenile court based on a history of abuse and neglect, and was placed in foster care after it was discovered that methamphetamine was being manufactured in her home. At the time of K.'s birth, Mother was 18 years old.

On September 5, 2012, the Department of Children and Family Services (DCFS) filed a section 300 petition on behalf of K., then five months old. The petition alleged that Mother was an abuser of methamphetamine and had tested positive for the drug on August 17, 2012, and that Father was an abuser of alcohol and had engaged in a physical altercation on August 13, 2012 while holding the child in his arms. It further alleged that the parents' conduct rendered them incapable of providing regular care to K. and placed the child at risk of physical harm. At the September 5, 2012 detention hearing, the juvenile court detained K. from both parents and ordered her placed in foster care.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     Kimberly is not a subject of this appeal.

In a September 21, 2012 interview with the DCFS, Mother admitted she had an extensive history of substance abuse, including alcohol, ecstasy, and methamphetamine. She regularly used methamphetamine during her pregnancy with K., and continued using the drug after the child was born and was in Mother's care. Mother had last used methamphetamine on September 16, 2012. Mother also reported that Father had a history of alcohol abuse and that he consumed alcohol on a daily basis, including times when he was caring for K. Father often was aggressive when he was under the influence of alcohol, and on one occasion while he was holding the child, he engaged in a violent altercation with a family friend who tried to prevent him from driving home drunk. Although Mother acknowledged to the DCFS that both she and Father had substance abuse issues, she nevertheless believed they were capable of providing K. with appropriate parental care.

## II.     Jurisdiction and Disposition Hearing

At the September 27, 2012 jurisdiction and disposition hearing, the juvenile court sustained the section 300 petition filed on behalf of K. as amended based on findings that Mother's history of methamphetamine use and Father's prior physical altercation placed the child at a substantial risk of harm. The juvenile court declared K. a dependent of the court under section 300, subdivision (b), ordered her removal from the custody of both parents, and granted the parents family reunification services. The court-ordered case plans for Mother and Father required them to participate in a full drug and alcohol program with random drug testing, a parenting education course, and individual counseling to address case issues. Both parents were granted monitored visitation with K. at least two times per week. On September 28, 2012, K. was placed in the home of non-related extended family members, Gloria S. and Jose C., who were friends of the child's paternal grandmother.

**III.  Six-Month Review Hearing**

In its March 2013 status review report, the DCFS advised the juvenile court that both parents had shown only limited compliance with their case plans.  Mother enrolled in the Clear Path Counseling Center on February 21, 2013, and Father enrolled in the same program on February 25, 2013.  Clear Path provided the parents with individual counseling, parenting education, and an outpatient substance abuse program.  However, Mother's counselor at Clear Path recommended that she enroll in an inpatient treatment program due to the extent of her methamphetamine addition.  Over a six-month period, Mother had two negative drug tests and failed to appear for nine tests.  Father had four negative drug tests, six no-show tests, and one positive test for amphetamine and methamphetamine on December 7, 2012.

The DCFS also reported that K. was doing well in the home of her caregivers, Gloria and Jose.  The child was meeting her developmental milestones and appeared to be happy and comfortable in their care.  Gloria was very affectionate toward K. and attentive to her needs, and told the DCFS that she and Jose were interested in adopting the child if she was unable to reunify with her parents.  Gloria also had been acting as the monitor for the parents' visits with K., and expressed concern about their behavior.  She indicated that both Mother and Father appeared to be under the influence of drugs or alcohol during some of the visits.  At times, they also arrived late or left the visits early, and they often argued with each other during the visits instead of engaging with the child.

On March 7, 2013, both Mother and Father advised the DCFS that they were not ready to have K. returned to their care, but they believed they could reunify with the child if given more time to address their substance abuse issues.  On March 19, 2013, Mother admitted to the DCFS that she had used methamphetamine the prior day, and explained that she was planning to enroll in an inpatient treatment program.  Mother also reported that she was five months pregnant, but had not sought prenatal care because she was afraid the baby might test positive for drugs at birth and be taken from her.  Mother further stated that she was in fear of Father because he had been physically and verbally abusive to her since the dependency case began.  Given the parents' continued drug use

4

and lack of compliance with their case plans, the DCFS recommended that family reunification services for both Mother and Father be terminated.

On May 1, 2013, following a contested six-month review hearing, the juvenile court terminated reunification services for both parents, and set a permanency planning hearing for K. to be held on August 28, 2013.

## IV.  Section 366.26 Permanency Planning Report

On August 28, 2013, the DCFS submitted a section 366.26 report for K.  As set forth in the report, K.'s placement with her caregivers, Gloria and Jose, remained stable and secure.  They continued to provide her with a safe and loving home, and she appeared to be thriving in their care.  Both Gloria and Jose conveyed that they were very attached to the child and committed to providing her with a permanent home.  The DCFS also reported that Mother and Father remained inconsistent in their visitation.  They showed up late to some visits and failed to attend others without providing notice to the caregivers.  The DCFS recommended that the juvenile court select adoption as the permanent plan goal for K., and continue the matter for the completion of an adoptive home study for Gloria and Jose.  On August 28, 2013, the juvenile court continued the permanency planning hearing to October 25, 2013.

## V.  Section 300 Petition for K.'s Sibling

Mother gave birth to her second child, Kimberly, on August 16, 2013.  On August 21, 2013, the DCFS filed a section 300 petition on Kimberly's behalf alleging that Mother's methamphetamine use placed the child at substantial risk of harm.  Kimberly was detained from both parents and placed in foster care.

In an August 23, 2013 interview with the DCFS, Mother recounted that she began using methamphetamine when she was 16 years old.  She regularly used the drug during her pregnancies with both K. and Kimberly, and throughout the time that K. was in her care.  When Mother was six months pregnant with Kimberly, she decided to stop using drugs and to get prenatal care so that the baby would not test positive for drugs at birth. Mother enrolled in a substance abuse program at Okuli Eagles Nest Foundation on May

5

15, 2013, and re-enrolled in the program at Clear Path Counseling Center on August 21, 2013 when the Okuli program closed. She currently was attending parenting classes, individual counseling, and an outpatient substance abuse program at Clear Path. Although Clear Path continued to recommend an inpatient program for Mother, she did not think it was necessary. Mother acknowledged to the DCFS that she had been addicted to methamphetamine in the past, including when K. was in her care, but she did not believe it affected her parenting. She also did not believe she was still addicted because she had not used the drug in the past three months and was doing well in her program.

In his August 23, 2013 interview with the DCFS, Father reported that he had completed parenting classes, individual counseling, and a substance abuse program at Clear Path, and was planning to attend Alcoholics Anonymous meetings. Father initially stated that he used to drink alcohol once every 15 days, and that it had been four months since he had a drink. He later admitted that he used to drink alcohol on a daily basis, and that he had three to four beers in the past four months. He also admitted that he was under the influence of alcohol at times when he visited K. Father did not disclose to the DCFS that he had a conviction for driving under the influence of alcohol on March 24, 2013. He also failed to disclose that he tested positive for methamphetamine on April 1, 2013 while attending the program at Clear Path. When asked if he intended to stop drinking alcohol for life, Father said that he did not know.

On October 17, 2013, the juvenile court sustained a first amended section 300 petition filed for Kimberly based on Mother's history of drug abuse, including her methamphetamine use while pregnant, Father's history of drug and alcohol abuse, including his driving under the influence alcohol conviction, and domestic violence between the parents. On November 6, 2013, the juvenile court declared Kimberly a dependent of the court under section 300, subdivision (b) and ordered her removal from parental custody. The court-ordered case plans for Mother and Father were the same as the ones ordered in the dependency case for K.

6

## VI.   Adoptive Home Study for K.'s Caregivers

In its October 25, 2013 status review report for K., the DCFS stated that the child was healthy and thriving in the home of Gloria and Jose, and that they remained committed to adopting her.  The parents' visits with the child continued to be sporadic.  Because the adoptive home study for Gloria and Jose was still not complete, the juvenile court continued the permanency planning hearing to November 21, 2013.  On that date, the DCFS advised the juvenile court that the adoptive home study had been approved and that the agency was recommending the termination of parental rights over K.  The court set the matter for a contested hearing on January 31, 2014.

## VII.   Section 388 Petitions Filed by Mother and Father

On December 30, 2013, Mother filed a section 388 petition in which she requested the return of K. to her custody, or alternatively, reinstatement of her reunification services and unmonitored visitation with the child.  In support of her petition, Mother submitted documents from Clear Path showing that she had completed 45 sessions of substance abuse counseling, 25 sessions of parenting education, and 12 sessions of individual counseling.  Clear Path had provided Mother with certificates of completion for its substance abuse and parenting programs in October 2013, and reported that Mother had been very receptive to treatment and committed to maintaining her sobriety.  Mother had attended 17 Alcoholics Anonymous meetings between August and October 2013 and had seven negative drug tests during that time.  Mother also submitted documents showing that she enrolled in the Dare U To Care residential drug treatment program on November 19, 2013, which was expected to be completed in one year.  The program offered individual and group counseling, relapse prevention, random drug testing, parenting and domestic violence education, and sober living services.

On January 15, 2014, Father also filed a section 388 petition requesting the return of K. to parental custody or reinstatement of family reunification services.  In support of his petition, Father submitted documents from Clear Path showing that he had completed 39 sessions of substance abuse counseling, 30 sessions of parenting education, and 10

sessions of individual counseling. Father received a certificate of completion from Clear Path for the parenting program in July 2013, and for the substance abuse program in August 2013. Father also had attended 19 Alcoholics Anonymous meetings between August and October 2013. On January 31, 2014, the juvenile court continued the matter for a hearing on the parents' section 388 petitions.

In response to Mother's section 388 petition, the DCFS reported that Mother had made several attempts to address her substance abuse issues, but had not been able to fully comply with her court-ordered services. Since K. was declared a dependent of the court in September 2012, Mother had been in multiple drug treatment programs. On October 12, 2012, she was referred to a residential program, but failed to attend the intake appointment. She enrolled in an inpatient program on November 30, 2012, but left a few days later. On February 21, 2013, Mother began a six-month outpatient program at Clear Path while pregnant with Kimberly, but left after three months. She re-enrolled in the program at Clear Path on August 21, 2013 and received a certificate of completion on October 16, 2013, despite not completing six months of continuous drug treatment. On November 19, 2013, Mother enrolled in the Dare U To Care residential program. The program's counselors reported that Mother had completed 10 group sessions on anger management, parenting, domestic violence, relapse prevention, and drug education. They stated that she was actively engaged in the program, learning social and coping skills, and adjusting to a drug-free lifestyle. However, the counselors also reported that, on January 18, 2014, Mother was disciplined for lying about another resident drinking alcohol on the premises, and she later disclosed that Father had provided the alcohol to the resident. Between August 2013 and January 2014, Mother had nine negative drug tests and two no-show tests. However, on February 4, 2014, a month after filing her petition, Mother was discharged from the Dare U To Care program because she had tested positive for methamphetamine. She also tested positive for marijuana on February 11, 2014, before enrolling in a new residential drug treatment program at His Sheltering Arms, Inc. on February 17, 2014. Based on this history of relapse, the DCFS recommended that Mother's section 388 petition be denied.

8

In response to Father's section 388 petition, the DCFS reported that Father also was struggling with unresolved substance abuse issues. He first enrolled in a six-month outpatient treatment program at Clear Path on February 21, 2013. On March 24, 2013, while in the program, Father was arrested for driving under the influence of alcohol and later sentenced to probation. On April 1, 2013, while still in the program, he tested positive for methamphetamine. Father nevertheless received a certificate of completion from the Clear Path program on August 20, 2013. On November 25, 2013, in an effort to comply with the services ordered in Kimberly's case, Father enrolled in a three-month aftercare program at Clear Path, and began participating in individual counseling, substance abuse counseling, and parenting education. Between August 2013 and April 2014, Father had 14 negative drug tests, three diluted drug tests, and two no-show tests. He also had an outstanding warrant for failing to report his compliance with the terms of his probation. His counselor at Clear Path reported that, although Father was attending an aftercare program, he continued to minimize his alcohol abuse and its negative impact on his life. Based on these facts, the DCFS recommended that Father's section 388 petition also be denied. The matter was continued for a contested section 388 hearing and a contested section 366.26 hearing.

## VIII. Status Review Reports

In status review reports filed on April 24, 2014 and May 15, 2014, the DCFS reported that K. continued to thrive in the home of Gloria and Jose. The child appeared to be healthy and happy in her placement, and was developing appropriately. K.'s caregivers were very bonded to the child and were providing her with a stable and nurturing home. Both Mother and Father had been attending weekly monitored visits with K. and were appropriate during the visits.

Although Father had completed his three-month aftercare program at Clear Path as of March 2014, the DCFS advised him that he needed to complete a full drug and alcohol program as ordered by the court in Kimberly's case. On March 10, 2014, Father enrolled in a substance abuse program at the New You Center, Inc. As of May 7, 2014, Father

9

had participated in three individual counseling sessions and nine group counseling sessions on substance abuse, parenting skills, and domestic violence. The program director reported that Father was diligently attending his scheduled sessions, and exhibited a positive attitude while actively engaging in group discussions. The director also noted that Father had resolved the outstanding warrant in his criminal case and had consistently tested negative for drugs and alcohol while in the program.

As of May 12, 2014, Mother was in compliance with her inpatient substance abuse program at His Sheltering Arms, and had tested negative for drugs since enrolling in the program on February 17, 2014. She was attending all of her scheduled group sessions and had begun working with an on-site clinical psychologist. Her psychologist reported that Mother had post-traumatic stress disorder and had been prescribed psychotropic medication for depression. The psychologist observed that Mother was developing necessary coping skills and displaying personal responsibility in her recovery, and recommended that she continue visiting her children and eventually receive unmonitored visits. In a June 20, 2014 letter, Mother's residential case manager reported that Mother was still struggling with her behavior. She noted that Mother had begun to address her issues with drugs and alcohol and appeared to be a very loving and caring mother during her visits with the children. However, the case manager also stated that Mother's "progress today is improving but still is unsatisfactory at this time."

## IX.   Contested Section 388 and Section 366.26 Hearings

On June 20, 2014, the juvenile court held the contested hearing on the parents' section 388 petitions and the contested section 366.26 hearing for K. The case social worker testified that, although both parents had received certificates of completion of a substance abuse program from Clear Path, they had not shown an ability to remain drug and alcohol free or to make responsible choices. Both Mother and Father had relapses during their first enrollment in the Clear Path program, and after completing the program, Mother had a positive methamphetamine test and Father had several diluted or no-show

10

tests. The case social worker believed that both parents needed to successfully complete another full substance abuse program to demonstrate their growth and sobriety.

Mother and Father asked the juvenile court to grant their section 388 petitions and either return K. to their care or reinstate their family reunification services. K.'s attorney requested that the court reinstate the parents' reunification services, but not return the child to their care at that time. The DCFS asked the court to deny the petitions on the grounds that the parents had not shown changed circumstances or that it would be in K.'s best interest to delay her permanent plan. The juvenile court denied both parents' petitions. While acknowledging that relapse was a part of recovery, the court stated that it was concerned about the parents' conduct during the rehabilitation process. Father had several diluted drug tests and had brought alcohol into Mother's residential treatment program, while Mother had two positive drug tests since filing her petition. The court also noted that K. was five months old when she was detained and had been out of her parents' care for two years. The court found that, while the parents had shown "changing circumstances," they had not demonstrated that they were ready to have unmonitored visits with K. or that the child could be safely returned to their care. The court further found that "no one has presented [that] it's in the best interest of K. to be returned from placement, where she is thriving, to . . . giving these parents six more months of reunification services. After almost two years in care, she's entitled to permanency. . . ."

After denying the parents' section 388 petitions, the juvenile court turned to the the section 366.26 portion of the proceedings. Both Mother and Father argued that, under the beneficial parent-child relationship exception of section 366.26, they had shown that they were visiting K. on a consistent basis and were strongly bonded to her, and that it would be in the child's best interest not to terminate their parental rights. Both the DCFS and the attorney for K. joined in arguing that the exception was not satisfied, and that after two years of bonding with her current caregivers, K. was entitled to a permanent home with them. The juvenile court found that K. was adoptable and the beneficial parent-child relationship exception did not apply. The court noted that the parents' visitation with the child had been fairly consistent, but that K.'s caregivers occupied the

parental role in her life.  The court ordered that parental rights over K. be terminated, and custody and control of the child be placed with the DCFS for adoptive planning and placement.[3]

Following the hearing, Mother and Father filed notices of appeal from the denial of their section 388 petitions and the termination of their parental rights over K.  K.'s attorney also filed a notice of appeal on the child's behalf from the denial of the parents' section 388 petitions.

## DISCUSSION

On appeal, K., Mother, and Father each argue that the juvenile court abused its discretion in denying the parents' section 388 petitions.  Mother and Father also assert that the juvenile court erred in ordering the termination of their parental rights over K. We conclude that neither of these contentions has merit.

## I.      Denial of the Section 388 Petitions

Section 388 is a general provision permitting the juvenile court, "upon grounds of change of circumstance or new evidence . . . to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."  (§ 388, subd. (a).) The statute allows the modification of a prior order only when the petitioner establishes by a preponderance of the evidence that (1) changed circumstances or new evidence exists; and (2) the proposed modification would promote the best interests of the child. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1193; *In re Y.M.* (2012) 207 Cal.App.4th 892,

---

**3**     On June 20, 2014, the juvenile court also held a contested six-month review hearing for Kimberly.  The DCFS had requested that the parents' family reunification services for Kimberly be terminated.  The court found that continued jurisdiction over the child was necessary, and ordered that both Mother and Father be provided with six additional months of reunification services.  On December 4, 2014, during the pendency of this appeal, the court held a contested 12-month review hearing for Kimberly.  At that time, the court found that neither Mother nor Father was in compliance with their case plans, terminated reunification services for both parents, and set the matter for a section 366.26 hearing to be held in April 2015.

12

919-920.) A parent seeking relief under section 388 "must show *changed*, not changing, circumstances. [Citation.] The change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.' [Citation.]" (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.) Moreover, "'[i]t is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child. [Citation.]'" (*In re S.J.* (2008) 167 Cal.App.4th 953, 960.) A parent requesting an order for reunification services after they have been terminated has the burden of proving that the benefit to the child of reinstating services outweighs the benefit the child would derive from the stability of a permanent placement. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.) We review a juvenile court's ruling on a section 388 petition for an abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

In this case, the juvenile court did not abuse its discretion in denying the section 388 petitions filed by Mother and Father. The record reflects that K. was detained from her parents on September 5, 2012 when she was only five months old. Both Mother and Father received family reunification services for K. over a seven-month period from September 27, 2012 to May 1, 2013. Even though they made efforts to comply with their case plans by enrolling in a substance abuse treatment program at the Clear Path Counseling Center in February 2013, neither Mother nor Father was able to maintain their sobriety during the reunification period. Mother admitted to the DCFS that she used methamphetamine on a regular basis between September 2012 and May 2013, despite the fact that she was pregnant with her second child during that time and knew her drug use was harmful to the fetus. Although Father told the DCFS that he tried methamphetamine only a handful of times, he tested positive for the drug in December 2012 prior to enrolling in the program at Clear Path, and again in April 2013 while he was participating in the program. While enrolled in the program, Father also was arrested for driving under the influence of alcohol, but did not disclose his arrest or subsequent conviction to the DCFS. Additionally, during the reunification period, there were times when both Mother

13

and Father showed up to the visits with K. under the influence of drugs or alcohol, and argued with each other instead of engaging with their child.

After the parents' reunification services were terminated on May 1, 2013, they continued to struggle with substance abuse issues and to demonstrate a lack of insight into their addictions. Mother enrolled in a new drug treatment program at the Okuli Eagles Nest Foundation on May 15, 2013, but she used methamphetamine less than two weeks later while she was six months pregnant with Kimberly. Mother re-enrolled in an outpatient substance abuse program at Clear Path in August 2013, and even though her counselors at Clear Path repeatedly recommended that she enroll in an inpatient program, Mother refused because she did not believe it was necessary. Mother also told the DCFS in August 2013 that she was no longer addicted to methamphetamine because she had not used the drug in three months. When asked what it meant to be addicted to drugs, Mother stated, "Like when you use all the time and you can't stop." She further denied that her prior methamphetamine use while K. was in her care had a negative impact on her parenting. Instead, Mother said that she felt happy with K. when she was using the drug and tired when she was not.

Despite completing a drug treatment program at Clear Path on August 20, 2013, Father also showed a lack of understanding about his own substance abuse issues. A few days after completing the program, Father was not forthcoming in an interview with the DCFS about the extent of his drug and alcohol use. He eventually admitted that he had consumed some alcohol in the past four months while enrolled in the Clear Path program and that he did not know if he would use alcohol again. Like Mother, Father denied that he had a current substance abuse problem, and he did not believe that his prior alcohol use while K. was in his care had posed any risk to the child. Although it is true that Father did not test positive for drugs or alcohol at any time after April 2013, he did have three diluted tests and two no-show tests between October 2013 and January 2014, while he was enrolled in an aftercare program at Clear Path. In addition, on January 8, 2014, a week before Father filed his section 388 petition, his counselor at Clear Path reported that Father continued to minimize his alcohol dependency and its impact in his life.

14

Even after the parents filed their section 388 petitions requesting the return of K. to their care, or alternatively, the reinstatement of their reunification services, they continued to exhibit poor judgment in their recovery process. On January 18, 2014, three days after filing his petition, Father brought alcohol into Mother's residential drug treatment program and provided it to another resident. Mother initially lied to the program about her knowledge of the incident and Father's involvement. On February 4, 2014, a month after filing her petition, Mother tested positive for methamphetamine and was discharged from her program. She also tested positive for marijuana the following week. By the time the contested section 388 hearing was held on June 20, 2014, both Mother and Father were enrolled in new substance abuse programs and were consistently testing negative for drugs and alcohol. They also were actively participating in their programs, though Mother's residential case manager reported in June 2014 that Mother's progress was still unsatisfactory. Nevertheless, given their extensive history of substance abuse and repeated relapses, each parent had achieved a relatively short period of stability at the time of the section 388 hearing and had not yet demonstrated an ability to maintain their sobriety over a significant period of time. As the juvenile court aptly observed, the recent progress made by the parents in their recovery showed a "changing circumstance," but "no changed circumstances" sufficient to satisfy section 388.

Both Mother and Father also failed to establish that the relief they were requesting in their section 388 petitions was in the best interests of K. The child was two and a half years old at the time of the section 388 hearing, and had been in the home of her caregivers, Gloria and Jose, for nearly two years. The DCFS reported that K. was happy, healthy, and thriving in her caregivers' home, and that they were providing her with a loving and nurturing environment. Gloria was observed to be very affectionate toward K. and attentive to all of her needs, and both she and Jose stated that they were strongly bonded to the child and were committed to adopting her. Although Mother and Father maintained monitored visitation with K. throughout the dependency case, the quality of their visits varied over time. As discussed, during the reunification period, both parents attended some of the visits while under the influence of alcohol or drugs. At times, they

15

also arrived late or left the visits early, and argued with one another instead of interacting with the child. After their reunification services were terminated, they continued to show up late to some visits and to miss others without providing notice to K.'s caregivers. It is true that at the time of the section 388 hearing, both parents were visiting K. on a more consistent basis and were appropriate with the child during the visits. However, the parents' improved interactions with K. over the course of their visitation did not demonstrate that their bond with the child was stronger than the one she had developed with her long-term caregivers. Given the parents' history of relapse, they also failed to show that the benefit to K. of reinstating their reunification services outweighed the benefit she would derive from the stability and security of a permanent home. Under these circumstances, the juvenile court did not abuse its discretion in denying each parent's section 388 petition.[4]

## II.     Termination of Parental Rights

At a hearing under section 366.26, the juvenile court must select and implement a permanent plan for a dependent child. Where there is no probability of reunification with a parent, adoption is the preferred permanent plan. (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) To implement adoption as the permanent plan, the juvenile court must find, by clear and convincing evidence, that the child is likely to be adopted if parental rights are terminated. (§ 366.26, subd. (c)(1).) Then, in the absence of evidence that a relative guardianship should be considered (§ 366.26, subd. (c)(1)(A)) or that termination of parental rights would be detrimental to the child under one of six statutorily-specified exceptions (§ 366.26, subd. (c)(1)(B)(i)-(vi)), the juvenile court "shall terminate parental rights." (§ 366.26, subd. (c)(1).) On appeal, Mother and Father

---

[4]     In light of our conclusion that the juvenile court did not err in denying the section 388 petitions, we need not address the DCFS's argument that K. is estopped from challenging this ruling on appeal because her attorney requested the termination of parental rights over the child at the section 366.26 hearing.

16

argue that the section 366.26, subdivision (c)(1)(B)(i) exception based on the beneficial parent-child relationship precluded the termination of their parental rights over K.

Section 366.26, subdivision (c)(1)(B)(i) provides that the juvenile court may decline to terminate parental rights if it "finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." A beneficial parent-child relationship within the meaning of section 366.26, subdivision (c)(1)(B)(i) is one that "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.) To establish the exception, "the parents must do more than demonstrate 'frequent and loving contact' [citation], an emotional bond with the child, or that the parents and child find their visits pleasant. [Citation.] Rather, the parents must show that they occupy 'a parental role' in the child's life. [Citation.]" (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109.) Furthermore, "'[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*In re K.P.*, *supra*, at p. 621.)

The parent has the burden of proving the statutory exception applies. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) The court's decision a parent has not satisfied this burden may be based on either or both of two component determinations—whether a beneficial parental relationship exists and whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); see *In re K.P.*, *supra*, 203 Cal.App.4th at p. 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) When the juvenile court finds the parent has not established the existence of the requisite beneficial relationship, our review is limited to determining whether the evidence compels a finding in favor of the parent on this issue as a matter of law. (*In re I.W.*

(2009) 180 Cal.App.4th 1517, 1527-1528.)[5]  When the juvenile court concludes the benefit to the child derived from preserving parental rights is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption, we review that determination for abuse of discretion.  (*In re K.P.*, *supra*, at pp. 621-622; *In re Bailey J.*, *supra*, at pp. 1314-1315.)

In this case, the juvenile court found that the parents' visitation with K. had been "fairly consistent," but they did not occupy a parental role in the child's life sufficient to establish the section 366.26, subdivision (c)(1)(B)(i) exception.  Mother and Father contend that the juvenile court's finding was not supported by substantial evidence because they were K.'s primary caregivers during the first five months of her life and maintained regular contact with the child after she was removed from their care.  The record reflects, however, that during the time K. was in the care of her parents as an infant, both Mother and Father regularly were under the influence of methamphetamine or alcohol, and Father once engaged in a violent physical altercation as he was holding the child in his arms.  Following K.'s removal from their care, Mother and Father began attending monitored visitation with the child, but the quality of their visits during the reunification period was often poor.

Both Mother and Father reason that, by the time of the section 366.26 hearing on June 20, 2014, the quality of their visits with K. had significantly improved as they became more stable in their rehabilitation.  Father notes that, in April 2014, K.'s

---

[5]     Because the juvenile court's factual determinations are generally reviewed for substantial evidence, it has often been posited a challenge to a finding that no beneficial relationship exists is similarly reviewed for substantial evidence.  (See, e.g., *In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)  The parent's failure to carry his or her burden of proof on this point, however, is properly reviewed, as in all failure-of-proof cases, for whether the evidence compels a finding in favor of the appellant as a matter of law.  (See *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 ["where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"]; *In re I.W.*, *supra*, 180 Cal.App.4th at pp. 1527-1528 [same].)

caregivers reported that he was engaging well with the child during his weekly visits. In addition, the case social worker testified at the section 366.26 hearing that Father was visiting his children on a regular basis. Mother points out that, in April and June 2014, her residential case manager reported that Mother was observed to be a very loving and caring mother during her visits with her children. However, because a child normally will derive some incidental benefit from interaction with a natural parent, "[c]ourts have required more than just 'frequent and loving contact' to establish the requisite benefit for the [section 366.26, subdivision (c)(1)(B)(i)] exception." (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["Interaction between natural parent and child will always confer some incidental benefit to the child. . . . The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent."].) Although a beneficial parent-child relationship can exist even without day-to-day contact, the parent still must occupy a parental role in the child's life. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) To be simply a "friendly visitor" is not sufficient. (*Id.* at p. 52.) While the evidence in this case showed that both Mother and Father had achieved a friendly and loving relationship with K., it did not establish that the relationship had reached the level at which the exception would apply.

Furthermore, there was substantial evidence before the juvenile court that K. was thriving in the home of her caregivers. As discussed, K. had been living with Gloria and Jose for the majority of her young life and had developed a strong and loving bond with their family. Gloria and Jose treated K. as their daughter, consistently demonstrated an ability to meet her needs, and repeatedly conveyed to the DCFS their desire to provide her with a permanent home. Although Mother and Father also showed a commitment to K. by taking positive steps to address their substance abuse issues, they did not prove that they had the kind of parental relationship that section 366.26, subdivision (c)(1)(B)(i) was designed to preserve. As the Court of Appeal observed in *In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350, "a child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but

does not meet the child's need for a parent. It would make no sense to forgo adoption in order to preserve parental rights in the absence of a real parental relationship." Considering the totality of the record, Mother and Father's evidence of an emotional bond with K. and regular monitored visitation with her failed to establish that the parental relationship "promote[d] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) The juvenile court accordingly did not err in finding that the section 366.26, subdivision (c)(1)(B)(i) exception did not apply.

## DISPOSITION

The orders of the juvenile court denying the section 388 petitions filed by Mother and Father and terminating their parental rights over K. are affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.

20