Filed 7/22/13; pub. order 8/6/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DREYER'S GRAND ICE CREAM, INC.,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>COUNTY OF KERN,<br><br>    Defendant and Respondent. | F064154<br><br>(Super. Ct. No. S-1500-CV-269386)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. William D. Palmer, Judge.

Cahill, Davis & O'Neall, C. Stephen Davis, John D. Cahill and Andrew W. Bodeau for Plaintiff and Appellant.

Theresa A. Goldner, County Counsel, and Jerri S. Bradley, Deputy, for Defendant and Respondent.

-ooOoo-

Plaintiff challenges the assessment of property taxes on the equipment and personal property in its novelty ice cream production lines. Plaintiff stipulated to or did not dispute various elements in the property tax assessment, leaving only a single issue to be determined: Whether plaintiff was entitled to a reduction in the value of the property, based on excess capacity or underutilization of the property, which plaintiff claims was

the result of lack of market demand for the products produced by the equipment. The Assessment Appeals Board (the board) found in favor of defendant, and the trial court upheld that decision. Plaintiff appeals, contending the trial court applied the wrong standard of review and, if the substantial evidence standard of review applies, there was insufficient evidence to support the judgment. We find no error and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff operates a facility that produces bulk ice cream, sold in half-gallon containers, and novelty ice cream products, such as ice cream bars, ice cream sandwiches, and push-ups. It runs 27 production lines, which operate independently, each generally producing only one type of product. In 2006, plaintiff filed an application for changed assessment, seeking to change the property tax assessment of the value of its property as of the lien date of January 1, 2006. At the hearing before the board, the parties stipulated to the value of the real property, buildings and fixtures, leaving only the value of the personal property and equipment in issue. Plaintiff's plant had undergone an expansion in 2005, adding new production lines to the facility; the parties agreed on the valuation of the equipment in the new production lines. The only issue presented at the administrative hearing was whether the value of the equipment and personal property in the preexisting production lines, referred to as the novelty lines, should be reduced due to external obsolescence in the form of excess capacity.

Plaintiff presented evidence of the annual production of each novelty line for the years 2003, 2004, and 2005. It calculated the facility's total capacity, allowing for holidays, weekends, an annual maintenance shutdown, regular shutdowns for cleaning, and unexpected interruptions. Using the actual production and total capacity figures, plaintiff calculated the capacity utilization as a percentage of total capacity for each year. Its evidence indicated its capacity utilization was 53.2 percent for 2003, 65.3 percent for 2004, and 63.5 percent for 2005. Plaintiff's plant controller, Timothy Selgelid, testified

2

these rates were historically not uncommon for the plant, and he anticipated a continuation of the historical utilization pattern in the future. Plaintiff's expert, Alex Steele, testified the facility had a persistent overcapacity, mostly in the novelty line equipment. He calculated the appropriate reduction for excess capacity to be 27.19 percent, or $13,905,831. He identified lack of market demand as the external factor that caused the overcapacity and justified a reduction for external obsolescence. Steele concluded there was a lack of market demand based on plaintiff's decrease in production and his research, which indicated that the market was volatile.

A representative of the assessor's office, Todd Reeves, testified that the appraised value of the equipment and improvements in issue was $147,646,375. He stated that there might be some underutilization, but he found no external factors that accounted for it. He considered making an underutilization adjustment, but determined it was not appropriate. Defendant also presented an expert economist, Dr. Mark Evans, who testified regarding economic obsolescence, which is concerned with external economic factors that are within the knowledge and expertise of economists. He testified that using less than 100 percent of capacity did not establish underutilization without evidence that external forces in the industry caused the deviation between capacity used and capacity available; he found no such evidence in plaintiff's records or in his research. Referring to Selgelid's testimony that the facility operates "as hard as it possibly can" during the summer months, but shuts down for about three weeks in the winter for major maintenance, Evans discussed the effect of seasonal fluctuations in production on excess capacity. Based on national figures provided by the federal government for production of ice cream and frozen desserts, Evans concluded the average company would require at least 25 percent excess capacity to allow the company to absorb seasonal fluctuations in demand. Additionally, based on plaintiff's production figures and on the published national figures, Evans stated that the trend in production from 2003 to 2005 was an

increase of 15 percent at the national level and 40 percent at plaintiff's facility. Evans opined that there might be good business reasons for maintaining some excess capacity in the facility, such as accommodating seasonal fluctuations in production or maintaining some potential for growth in order to preserve the company's dominance in the marketplace.

The board found in favor of defendant. It noted that, when external factors cause machinery or equipment to lose value, the taxpayer is entitled to an adjustment for external obsolescence; to show that such an adjustment applied, plaintiff had the burden of proving some factor external to the property caused a decline in its value. The board concluded that, while plaintiff's exhibits showed the percentage of capacity used declined in 2005, they also showed that production increased between 2003 and 2005. The decrease in percentage of capacity used was primarily due to expansion in the production lines that increased capacity, not to market factors. Plaintiff's expert opined there was a decrease in demand for novelty products during the relevant period, but presented no evidence to support his opinion. The board also noted that Evans was persuasive when he testified the market conditions necessary to show economic obsolescence and inutility were not present. The board expressly found plaintiff did not present sufficient evidence to prove external factors created economic obsolescence; it failed to prove either excess capacity or an external market condition that justified application of economic obsolescence.

Plaintiff sought review of the board's decision by filing a complaint in the trial court for a refund of a portion of its property taxes. After determining that the standard of review was substantial evidence, the trial court ruled in favor of defendant, finding that substantial evidence supported the findings of the board and adopting those findings. The trial court noted the only external force cited by plaintiff in support of its claim of external obsolescence was a lack of market demand, which it attempted to prove through

4

its own experience. The trial court rejected plaintiff's assertion that lack of market demand was established by Selgelid's testimony that plaintiff was selling all the ice cream it produced and it could have produced more if it could have sold it. It noted that production on the novelty lines increased each of the three years leading up to 2006, and plaintiff expanded these lines during that time period. The trial court concluded there was substantial evidence in the administrative record to support the board's decision that plaintiff failed to meet its burden of proof; it affirmed that decision. Plaintiff appeals from the trial court's decision.

## *DISCUSSION*

### I.      Standard of Review

The initial issue presented by this appeal concerns the appropriate standard of review in the trial court. "The duty of determining the value of the property and the fairness of the assessment is confided to the appropriate county board of equalization. In discharging this duty, the board's determination upon the merits of the controversy is conclusive. The taxpayer has no right to a trial de novo in the superior court to resolve conflicting issues of fact as to the taxable value of his property. [Citation.]" (*Norby Lumber Co. v. County of Madera* (1988) 202 Cal.App.3d 1352, 1362.) "Where the taxpayer claims a valid valuation method was improperly applied, the trial court is limited to reviewing the administrative record. [Citation.] The court may overturn the assessment appeals board's decision only if there is no substantial evidence in the administrative record to support it. [Citation.] However, where the taxpayer challenges the validity of the valuation method itself, the court is faced with a question of law. In such a case, the court does not evaluate whether substantial evidence supports the board's decision, but rather must inquire into whether the challenged valuation method is arbitrary, in excess of discretion, or in violation of the standards prescribed by law. [Citation.]" (*Maples v. Kern County Assessment Appeals Bd.* (2002) 96 Cal.App.4th

5

1007, 1013.) "Whether a taxpayer is challenging 'method' or 'application' is not always easy to ascertain. [Citation.]" (*Ibid*.)

Plaintiff asserts the issue in the trial court was whether the tax assessor and the board applied a proper and complete method in calculating the value of the property. It contends the assessor and board failed to include in the valuation an adjustment for economic, or external, obsolescence, which was mandatory pursuant to California Code of Regulations, title 18, section 6 (Rule 6).[1] Plaintiff concludes this is a question of law subject to de novo review in the trial court. Defendant contends the only issue was a factual one: Whether, in the administrative proceeding, plaintiff demonstrated the factual prerequisites that would entitle it to an adjustment for economic obsolescence. Defendant asserts the assessor considered whether the adjustment should be made, but rejected it because the factual predicates were not present; the board agreed with that assessment. Consequently, defendant concludes, the issue was one of fact and the trial court correctly applied the substantial evidence standard of review.

Property subject to taxation must be assessed at its full value, which is defined as its full cash value or fair market value. (Rev. & Tax. Code, §§ 110.5, 401.) There are three basic methods for calculating fair market value: (1) the comparative sales or market data method; (2) the reproduction or replacement cost method; and (3) the income method. (Cal. Code Regs., tit. 18, §§ 3, 4, 6, 8; *Pacific Mutual Life Ins. Co. v. County of Orange* (1985) 187 Cal.App.3d 1141, 1147.) In this case, the parties agreed the value of the property should be calculated by using the reproduction or replacement cost new less depreciation (RCLND) method, which is described in Rule 6.

---

[1]     The Legislature has authorized the state's Board of Equalization (SBE) to prescribe rules and regulations to govern the operation and functioning of local tax assessors and boards of equalization. (Gov. Code, § 15606.) Those regulations are found in the California Code of Regulations, title 18. The parties refer to California Code of Regulations, title 18, section 6, as "State Board of Equalization Property Tax Rule 6" or simply Rule 6. We will follow their lead.

In calculating value under Rule 6, "[r]eproduction or replacement cost shall be reduced by the amount that such cost is estimated to exceed the current value of the reproducible property by reason of physical deterioration, misplacement, over- or underimprovement, and other forms of depreciation or obsolescence." (Rule 6, subd. (e).) "Physical deterioration is the loss in value which may be the result of wear and tear either from use or exposure to various elements." (SBE Assessors' Handbook[2], § 504, Assessment of Personal Property & Fixtures (Oct. 2002) p. 71.) External obsolescence "is a loss in value resulting from adverse factors external to the property that decrease the desirability of the property. This type of depreciation may include the loss of value due to: inflation, high interest rates, legislation, environmental factors, *reduced demand for the product*, increased competition, changes in raw material supplies, and increasing costs of raw material, labor or utilities without a corresponding price increase of the product." (*Id*. at p. 72, italics added.)

In the trial court, the parties agreed that the cost approach to valuation is the appropriate method for determining the value of the equipment and other improvements in issue. Plaintiff did not dispute the assessor's adjustment for ordinary depreciation. It disputed only the lack of an adjustment for economic obsolescence. Because Rule 6 states that reproduction or replacement cost "shall" be reduced by an amount for obsolescence, plaintiff contends a reduction for economic obsolescence was mandatory in this case, and the board used an incomplete method of valuation because it omitted that reduction.

Plaintiff contends an adjustment for economic obsolescence was required because its production facility was not operating at full capacity. An underutilization adjustment[3]

---

**2** State Board of Equalization, Assessors' Handbook (SBE Assessors' Handbook) <http://www.boe.ca.gov/proptaxes/ahcont.htm> [as of July 18, 2013].

**3** A number of terms have been used interchangeably in this case to refer to the adjustment required by Rule 6 for "overimprovement": underutilization, excess capacity, inutility.

"may be appropriate when equipment is significantly underutilized, that is, it may be appropriate when property is not used at design or expected capacity.… [¶] Utilization adjustments may be made when there is excess capacity that is beyond the control of a prudent operator that is recognized in the market." (SBE Assessors' Handbook, *supra,* § 504, at p. 79.) "[T]his type of adjustment is not appropriate for all or even most types of properties (or equipment). Even when a property operates significantly below design capacity, there may be no under-utilization and a utilization adjustment would not be appropriate." (*Id*. at p. 80.) Thus, although Rule 6 mandates reducing the reproduction or replacement value of the property for overimprovement and other forms of obsolescence in order to arrive at fair market value, it is mandated only when overimprovement or underutilization is shown to exist and the adjustment is needed in order to arrive at fair market value of the property. The underutilization adjustment is appropriate only when (1) there is excess capacity, (2) that is beyond the control of a prudent operator (3) and recognized in the market. (SBE Assessors' Handbook, *supra,* § 504, at p. 79.)

There was no dispute at the administrative proceeding or in the trial court that the cost method of valuation applied, or that it required reductions for certain items, including underutilization, if applicable. Defendant acknowledged that underutilization was a consideration, and it presented evidence showing that there was discussion between the assessor's office and plaintiff's representatives regarding whether the adjustment applied; defendant also presented evidence that it prepared a calculation of an underutilization adjustment, based on numbers provided by plaintiff, but determined the adjustment was not warranted. The board found that the assessor carefully considered making the adjustment, but determined it was not warranted. Thus, the issue before the trial court was not one of law: Whether the cost method of valuation mandated making an underutilization adjustment in an appropriate case. Rather, the issue was one of fact:

8

Whether on the evidence presented the board could conclude that plaintiff failed to satisfy its burden of proving an underutilization adjustment was appropriate in this case. The trial court properly applied the substantial evidence standard of review.

## II.    Substantial Evidence to Support the Judgment

The burden is on the taxpayer challenging an assessment to prove that the property has not been properly assessed.  (Cal. Code Regs., tit. 18, § 321, subd. (a); *Texaco Producing, Inc. v. County of Kern* (1998) 66 Cal.App.4th 1029, 1046.)  "If the applicant has presented evidence, and the assessor has also presented evidence, then the board must weigh all of the evidence to determine whether it has been established by a preponderance of the evidence that the assessor's determination is incorrect."  (Cal. Code Regs., tit. 18, § 321, subd. (b).)  The board found plaintiff did not meet its burden of proving that an adjustment for economic obsolescence was appropriate:  It found plaintiff did not present sufficient evidence to prove that it had excess capacity, or that external factors (as opposed to its own business judgment), or any factors recognized in the marketplace, caused an excess in capacity.

"In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.…  [¶]  Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) uncontradicted and unimpeached and (2) of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.  [Citation.]"  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)  The appellate court cannot substitute its factual determinations for those of the trial court; it must view all factual matters most favorably

9

to the prevailing party and in support of the judgment.  (*Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 60.)  "'All conflicts, therefore, must be resolved in favor of the respondent.'  [Citation.]"  (*Ibid.*)

The cost approach to property valuation "is based upon the economic principle of substitution," which "holds that a rational person will pay no more for a property than the cost of acquiring a satisfactory substitute."  (SBE Assessors' Handbook, § 501, Basic Appraisal (Jan. 2002) p. 75.)  It begins with either reproduction cost (the cost to replace an existing property with a replica of it), replacement cost (the cost to replace an existing property with a property of equivalent utility), or historical cost (the cost of the property at the time of its original acquisition); it then makes adjustments for depreciation to reach an estimate of current value.  (*Id.* at pp. 77-78, 80.)  In appraisals, depreciation is "a measurement of the extent to which the subject property is, at a particular point in time, worth less than a hypothetical new property."  (SBE Assessors' Handbook, § 502, Advanced Appraisal (Dec. 1998) p. 21.)  There are three general types:  physical deterioration, functional obsolescence, and external obsolescence.  (*Ibid.*)  External obsolescence "is a loss in value caused by negative influences outside of the subject property that are generally beyond the control of the subject property owner .…  The presence and extent of external obsolescence can be identified by examining the overall market conditions of a property."  (*Id.* at p. 22.)

"A utilization adjustment to a Replacement Cost Less Normal Depreciation (RCLND) estimate may be appropriate when equipment is significantly underutilized, that is, it may be appropriate when property is not used at design or expected capacity.  This condition of underutilization … usually originates with external forces.  These external forces diminish the demand for use of the property which results in the existence of property with capacity that would not be replaced."  (SBE Assessors' Handbook, *supra,* § 504, at p. 79.)  "Utilization adjustments may be made when there is excess

10

capacity that is beyond the control of a prudent operator that is recognized by the market. Generally, the amount of obsolescence is a function of the difference between the replacement cost new of the existing property versus the replacement cost new of a property with a capacity that is adequate for the foreseen requirements." (*Id*. at p. 79.)

Rule 6 requires that the reproduction or replacement value of the property be adjusted for overimprovement only when overimprovement or underutilization is shown to exist and that underutilization affects the fair market value of the property. (Rule 6, subd. (e).) Thus, not all use at less than full capacity constitutes underutilization for purposes of Rule 6, subdivision (e). The underutilization adjustment is appropriate when (1) there is excess capacity, (2) that is beyond the control of a prudent operator (3) and recognized in the market. (SBE Assessors' Handbook, *supra,* § 504, at p. 79.) Plaintiff contends that it proved the existence of each of these criteria for application of the external obsolescence adjustment, and its evidence was undisputed, so the adjustment is mandatory.

Selgelid testified that the novelty lines were operating at only 53.2, 65.3, and 63.5 percent of practical capacity in 2003, 2004, and 2005, respectively. He stated plaintiff's production is demand driven; it is determined by how much it can sell. Plaintiff does not use its excess capacity to produce more products because it cannot sell more; if it could sell more, it would make more. Its sales forecast and inventory levels determine how much it produces. Plaintiff makes an annual plan in the third quarter of the year for the next calendar year; if something does not sell well, adjustments are made.

Plaintiff contends Selgelid's testimony established that it was producing as much of its products as the market would bear, but it was not using its full capacity; therefore it proved external obsolescence in the form of lack of market demand. Plaintiff also contends its showing was undisputed because defendant admitted in its trial brief that plaintiff is a "prudent operator," Reeves testified he thought plaintiff would make more

11

ice cream and sell it if it could, and, when Evans was asked whether he thought plaintiff could sell more ice cream if the facility produced more, he responded that he believed, "just as they testified, they're adjusting their production to demand."

When a reviewing court applies the substantial evidence standard, it must review the whole record to determine whether it supports the judgment. (*Quigley v. McClellan* (2013) 214 Cal.App.4th 1276, 1282-1283.) It may not confine its consideration to isolated bits of evidence. (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1218.) The evidence, considered as a whole, does not compel a finding in favor of plaintiff as a matter of law.

Selgelid testified to his belief that plaintiff was producing ice cream products in accordance with market demand. He was not asked, and did not explain, how he determined what the market would bear. He testified production was based on sales forecasts and an annual plan; he did not explain on what information those forecasts and plans were based. Plaintiff argues in its opening brief that an expert's opinion without a factual foundation does not constitute substantial evidence. A lay person's opinion without an established factual foundation does not appear to be any more weighty or convincing. Plaintiff's evidence also did not address whether the claimed lack of demand was recognized in the market. The assessor's handbook suggests it is the overall market conditions of a property that establish external obsolescence. (SBE Assessors' Handbook, *supra,* § 502, at p. 22.) Plaintiff presented no evidence of market demand, only conclusions it asserted were based upon its own experience. It offered no authority demonstrating that this was sufficient to establish external obsolescence due to lack of demand for its products.

Plaintiff's argument also ignores a good deal of relevant evidence. At the hearing in June 2009, Selgelid testified he had been with plaintiff for almost four years; thus, he did not work for plaintiff during most of the 2003 to 2005 time period which plaintiff's

arguments about excess capacity were based on. Thus, his statements about production being driven by demand were not based on personal knowledge of the relevant time periods. The calculations of capacity about which Selgelid testified were summaries of annual totals. He testified that, while plaintiff could manufacture novelty products during the off season and keep them in inventory until needed, it was very expensive to hold ice cream at 20 degrees below zero; instead, from Easter through Labor Day, plaintiff operated the facility as hard as it possibly could, to make the products and sell them without holding them in inventory.

Plaintiff's appraisal expert, Alex Steele, opined that there was a persistent overcapacity status at plaintiff's facility, mostly within the novelty line equipment. He also testified that generally plants are not built to 100 percent capacity, without excess; they leave some latitude in the design to allow for increases in capacity. Steele conceded that external factors are necessary in order to establish economic obsolescence; he identified lack of market demand as the external factor in this case. He testified he determined lack of demand by looking at capacity versus production. He stated he looked at industry data for the relevant time period, and had excerpts from articles that showed a lot of volatility in the marketplace; the articles indicated demand for novelty products was generally down. Steele did not identify any of the articles or submit them as evidence.[4]

Reeves, a supervising auditor/appraiser for defendant, testified he was not comfortable with the production capacity numbers provided by plaintiff and had trouble understanding how the capacity was calculated. He stated that, from studying the market,

---

[4]     In fact, plaintiff's counsel objected to further questioning about articles or demand, because neither was part of plaintiff's case or the subject of questioning on direct examination. "[W]hat Mr. Steele did was look at the differential between utilization and capacity, examined that shortfall. This whole discussion about demand direction and component volatility and the like was not part of the direct examination."

13

he did not see any external factors that would indicate excess capacity. Another auditor in defendant's office prepared a calculation of an economic obsolescence adjustment, so they could understand what plaintiff was asking for, but they determined the adjustment was unwarranted. Evans, defendant's expert economist, testified he did not find evidence of economic obsolescence in the materials he reviewed, which included plaintiff's calculations of obsolescence, the assessor's handbooks, and industry data on capacity utilization. He presented national market data for the ice cream and frozen dessert industry showing production fluctuates from month to month, with peak production in June. The average production in June was 26.9 percent higher than the average annual production, so he concluded an average producer in the industry would need about 27 percent more capacity during peak season than was used on average throughout the year. In his opinion, that 27 percent could not be considered excess capacity establishing economic obsolescence because it would probably be attributable to seasonal fluctuation. Evans noted that plaintiff's capacity calculations were based on annual averages, without accounting for seasonal changes in production. Evans opined that, in addition to allowing for seasonal fluctuations, a company would want to allow enough capacity for anticipated increases in demand; a dominant company in an industry would want to maintain its competitive advantage by holding some excess capacity to permit it to respond to competitors' actions. He concluded that, if a company is holding capacity because it is in the best interests of the company or its shareholders to do so, that is not obsolescence for the purpose of valuation.

The evidence was conflicting, not undisputed. It did not compel a finding, as a matter of law, that there was excess capacity at plaintiff's facility, which was caused by external forces beyond plaintiff's control and recognized in the market. Plaintiff's attempt to show excess capacity relied on annual average production figures that failed to account for seasonal fluctuations. Selgelid testified that the facility produced more ice

14

cream products during its summer peak season than during the winter months. Plaintiff presented little or no evidence that any excess capacity was due to an external cause, beyond the control of plaintiff. Plaintiff relied on Selgelid's testimony to establish that its level of production was dictated by market demand, but his evidence also indicated plaintiff's production was based on its internal forecasts of anticipated demand. Even plaintiff's expert, after identifying lack of market demand as the external cause of the claimed external obsolescence in this case, testified he determined lack of demand by looking at plaintiff's production compared with its capacity. Plaintiff presented no data from the marketplace or other evidence of market demand. Consequently, the evidence supported the board's conclusion that plaintiff failed to sustain its burden of proof and the trial court's determination that substantial evidence supported the board's decision.

## III.    Plaintiff's Other Arguments

Plaintiff's specific arguments do not demonstrate error in the trial court's decision. Plaintiff argues that an expert opinion unsupported by a factual foundation is not substantial evidence. It does not identify any expert it contends lacked support for his opinions, or identify any opinions that lacked factual support.

Plaintiff quotes testimony of Evans about when a taxpayer is entitled to an adjustment for economic obsolescence: "The State Appraiser's Handbook explicitly states that, that evidence would have to be collected to document that there's external forces in this industry and in this economy that are, for the most part, permanently causing this deviation between capacity used and capacity available." Plaintiff asserts industrywide documentation and permanency are not required for such an adjustment. It argues: "The Board nevertheless accepted Dr. Evans' statements at face value, finding: 'Dreyer's did not produce any *evidence demonstrating an external market condition* which justifies the application of additional depreciation for economic obsolescence.'" The quote from the board's decision does not mention either "industrywide

15

documentation" or "permanency" as prerequisites to making an economic obsolescence adjustment. The added italicization suggests plaintiff takes issue with the board's focus on evidence of an external market condition. The assessor's handbooks define external or economic obsolescence in terms of external conditions: "The loss in utility and value due to an incurable defect caused by external negative influences outside the property itself." (SBE Assessors' Handbook, *supra,* §§ 504, at p. 246; 502, at p. 199.) "External obsolescence, also known as economic obsolescence, is a loss in value resulting from adverse factors external to the property that decrease the desirability of the property." (*Id.,* § 504, at p. 72.) "Unlike physical deterioration and functional obsolescence, which are intrinsic to the property, external obsolescence is caused by extrinsic forces." (*Id.,* § 502, at p. 22.) The economic obsolescence on which plaintiff based its claims was that caused by a lack of market demand for products produced by its equipment. Accordingly, the board's focus on evidence of external market conditions to establish plaintiff's claim of economic obsolescence is understandable. Nothing in the language plaintiff quoted from the board's decision demonstrates that the board applied an incorrect standard in determining whether plaintiff met its burden of proving economic obsolescence.

Plaintiff asserts it was not required to prove that the demand for novelty ice cream products had declined; it was sufficient to show that demand, an external factor, was inadequate relative to production capacity. Plaintiff contends it proved lack of demand warranting an economic obsolescence adjustment, but the board found it failed to prove a *decline* in demand.

The assessor's handbook states external obsolescence "may include the loss of value due to: … reduced demand for the product." (SBE Assessors' Handbook, *supra,* § 504, at p. 72.) The board stated reduced demand was the only one of the conditions listed that plaintiff identified as a justification for a reduction in value. Steele testified

16

concerning a decrease in market demand. The board concluded plaintiff produced no evidence that supported a conclusion that an economic obsolescence adjustment was justified by a decline in demand. The board, however, also discussed plaintiff's claim of excess capacity. It reviewed Selgelid's testimony that the plant was underutilized because it was not operating anywhere near the 85 percent capacity he believed it could achieve. It discussed Evans' testimony that unused capacity was not "excess" if it had value to the company. The board concluded plaintiff failed to prove the capacity was excess or merited an inutility adjustment. It also concluded plaintiff did not present any evidence the unused capacity was due to anything other than its own business judgment. Thus, it found plaintiff did not establish an external condition as a cause of the claimed underutilization of the equipment. The trial court stated: "Nothing in the record or in the argument presented before this Court supports any theory that an adjustment for inutility is mandatory if the facility does not operate at 100 percent capacity. As stated above, even Plaintiff concedes that the inutility must be due to external forces." The trial court applied the substantial evidence standard, and upheld the board's decision, implicitly approving the board's finding that plaintiff did not establish any external force causing the inutility. Thus, the decision of the board and the trial court addressed both a claim based on underutilization due to a decline in demand and a claim of underutilization based on an ongoing difference between demand and capacity.

Plaintiff also contends the board erroneously concluded underutilization of the novelty production lines was caused by expanding production capacity. There was evidence that three of the novelty lines were modified in 2003, resulting in increased capacity. The board also mentioned that plaintiff expanded other lines, which are not in issue in this case. It noted that production also increased during this time period. It concluded "the decrease in percentage of capacity used was related not to a change in market conditions, but to [plaintiff's] investment and expansion of the facility itself. This

17

does not constitute an external market condition which justifies the application of additional depreciation for economic obsolescence." The board determined plaintiff's evidence was insufficient to prove external factors created economic obsolescence. The board effectively rejected reliance on plaintiff's individual experience and level of production as proof of market demand.

The board did not rest its decision solely on evidence of the expansion of capacity on plaintiff's production lines, however. It discussed all of the conflicting evidence presented and found insufficient evidence to establish obsolescence based on external factors. Resolving conflicts in the evidence in favor of defendant, as we must, the evidence was not sufficient to compel a finding in favor of plaintiff as a matter of law. The trial court correctly determined that substantial evidence supported the board's decision.

## *DISPOSITION*

The judgment is affirmed. Defendant is awarded its costs on appeal.

_____
HILL, P. J.

WE CONCUR:


_____
CORNELL, J.


_____
GOMES, J.

18

Filed 8/6/13

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DREYER'S GRAND ICE CREAM, INC.,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>COUNTY OF KERN,<br><br>    Defendant and Respondent. | F064154<br><br>(Super. Ct. No. S-1500-CV-269386)<br>Kern County<br><br>**ORDER GRANTING REQUEST<br>FOR PUBLICATION** |

As the nonpublished opinion filed on July 22, 2013, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered therefore that the opinion be certified for publication in the Official Reports.

_____
                   HILL, P. J.

WE CONCUR:

_____
CORNELL, J.

_____
GOMES, J.