Filed 7/22/24  Keeler-Hodgetts v. Tsukroff CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| KATHERINE KEELER-HODGETTS, Plaintiff and Appellant, v. BRANDON TSUKROFF, Defendant and Respondent. | A166521 (Alameda County Super. Ct. No. HF21102556) |

**INTRODUCTION**

Katherine Keeler-Hodgetts and Brandon Tsukroff are the parents of twin daughters they have jointly parented since their birth in 2012.

On June 22, 2021, four years after their relationship and cohabitation had ended, Katherine filed a request for a domestic violence restraining order (DVRO) against Brandon.  In the request, Katherine stated Brandon "has been abusing me and our twin girls for years . . . .  Recently, he has been surreptitiously filming our custody exchanges without my consent, which is upsetting both to me and to the children.  Because of this filming and the many previous instances of abuse, the children and I feel harassed."  The DVRO request went on to describe several incidents that occurred several

1

years earlier in which Brandon had engaged in profanity laced rants, destroyed Katherine's property, and threatened self-harm.[1]

Approximately one year later, in her May 27, 2022 trial brief, Katherine alleged for the first time that Brandon had "sexually violated" her throughout their relationship. During an incident which allegedly occurred while visiting her parents, Brandon "stripped her naked, gagged her, tied her hands behind her back, took her downstairs, and forced himself upon her."

These matters were the subject of a four-day trial, at which the court heard testimony of the parties and their witnesses.

On September 6, 2022, after receipt of testimony and closing arguments of counsel, the court issued a comprehensive 15-page statement of decision denying Katherine's request for a DVRO. The court found Katherine had failed to prove by a preponderance of the evidence that Brandon sexually abused her during their live-in relationship between 2010 and 2017. The court found Katherine was simply "not credible" because she failed to bring the sexual abuse allegations any time before the contested hearing. The court found it was even "more incredulous" that Katherine would have agreed to share custody with Brandon if the sexual abuse allegations were true. The court found the other incidents did not rise to the level of " 'abuse' " within the meaning of the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200, et seq.).[2]

Katherine seeks reversal of the court's denial of her DVRO request on the grounds that the court failed to consider the totality of the circumstances given the uncontroverted evidence of past abuse. She also contends the court

[1] The court denied Katherine's request for a temporary restraining order and set the matter for a hearing, which was later held in June 2022.

[2] All further undesignated statutory references are to the Family Code.

2

erred by "taking a limited view of how domestic violence victims should act in response to abuse."

The State of California takes allegations of domestic violence seriously, as do we. The statements which Katherine cites out of context do not establish that the trial court misunderstood its duty, nor that it took "a limited view of how domestic violence victims should act in response to abuse." We affirm the judgment because Katherine failed to establish that the trial court abused its discretion in denying her request for a DVRO.

**FACTS**

Katherine's opening brief describes numerous incidents of alleged domestic violence by Brandon that occurred during the relationship and continued after their separation in 2017.

### *Alleged Incidents of Abuse Between 2010 and 2017*

Katherine testified that during their seven-year relationship, Brandon would threaten her, scare the children, break objects, and harm himself. He was often intoxicated during these incidents. Katherine admitted drinking too much herself, but she had since gotten her drinking under control.

Katherine said she began using her phone to record the incidents out of safety concerns for herself and the children. These recordings, which were made without Brandon's knowledge or consent, were played at trial.[3]

### *Alleged Violent Behavior*

Katherine described an incident in 2016 where Brandon screamed and berated her for moving a garden hose. In 2017, while attempting to change a

---

[3] We have reviewed the recordings lodged in the record on appeal. Although Katherine submits transcripts of the recordings, with the exception of one video, it does not appear transcripts accompanied the recordings at the time they were played in the trial court.

3

faucet, Brandon tried to use a butane torch to loosen the joint and became frustrated when he could not light the torch. The audio recordings of these incidents reflect Brandon screaming obscenities at Katherine in a frightening tone.

In 2016 or 2017, Brandon intentionally smashed Katherine's Beatrix Potter porcelain set that she had saved from childhood. A video shows shattered porcelain fragments all over the floor; Brandon can be heard saying "I broke it all."

Katherine testified about other incidents that were not recorded. In 2015, Brandon became enraged while Katherine was unloading the dishwasher. He picked up a handful of compost from the compost pail and smeared it all over the clean dishes, the silverware, and the stove, repeating, " 'Is that clean? There, that's clean.' " On another occasion, Katherine came home to find the children crying. The children said, " 'Daddy is in the kitchen. He is very angry. He is breaking dishes. He is throwing food away.' "

Also in 2015, Brandon broke the top of a bookshelf that had belonged to Katherine's great-grandmother after he lost his keys behind it.

***Alleged Sexual Assaults***

Katherine testified that in 2016, while the family was visiting Katherine's parents in Santa Barbara, Brandon gagged and zip-tied her late at night and forced her to walk naked downstairs, through the living room, into an end room, while six other family members were in the house. Katherine testified she told a consulting psychologist about the sexual abuse. In posttrial briefing, Brandon argued that despite the obvious relevance of such evidence, Katherine had not told her own attorneys in either the DVPA action or related parentage action that Brandon had sexually abused her.

4

*Alleged Suicide Attempt*

On March 23, 2017, Brandon was upset because Katherine's brother had visited their house that day and arrived an hour late. As the evening progressed, Brandon's anger intensified, and he became more aggressive and frightening. While he and Katherine were putting the girls to bed, Brandon threatened to shoot himself in the head. The audio recording of the incident is laced with profanity and graphic descriptions of self-harm.

Brandon explained that he had been drinking heavily on March 23, 2017 and his conduct was triggered by Katherine's announcement that she had enrolled the children in a school in Santa Barbara without his permission. Although the parties had talked about retiring in Santa Barbara, Katherine's unilateral decision moved up their "timeline by five, seven years." He felt she was "essentially taking the children away" from him. There was no way he could move and still be an Oakland firefighter.

Brandon denied that his statement about blowing his brains out was a suicide threat. However, he "[a]bsolutely" agreed "parts of my history are punctuated by very regrettable violence." Brandon admitted the recorded incidents were "emotionally violent," for which he expressed deep remorse. Brandon testified he had been drinking heavily and was under extreme stress during these incidents. Brandon said Katherine also drank heavily and argued with him in an aggressive manner, but he did not think to record those incidents.

Brandon vehemently denied the sexual assaults. In fact, the first he heard of the sexual assault allegations was after Katherine filed her initial DVRO request. Brandon said the allegations "seemed to coordinate" with the hiring of Katherine's new domestic violence expert.

5

Brandon had been sober since May 2017 and had sought support from a therapist in maintaining his sobriety and dealing with his anger issues. He sold his guns the day after he and Katherine separated. Since the time of their separation, there had been no further incidents like the ones in the recordings.

### Alleged Incidents of Abuse After the 2017 Separation

Following their separation, Katherine voluntarily participated in the children's visitation with Brandon. In summer of 2017, Katherine and Brandon began "more formal" exchanges at a coffee shop.

### Brandon's Videotaping of Katherine and the Children

Katherine testified about an incident where Brandon appeared unexpectedly at the children's school in June 2017. When Katherine arrived at the school, Brandon began videotaping her. Brandon said that Katherine "terrified" him and called her an "abuser." On another occasion in 2017, Brandon videotaped Katherine, the girls, and their nanny at Katherine's van. When the nanny asked Brandon to stop recording them, he replied, "That's okay," and continued filming them. Brandon wanted to talk about the custody case, but Katherine said it was not appropriate because the "children are listening." In response, Brandon said, "I felt very threatened by you, Katherine . . . [¶] . . . You advanced on me. I felt very threatened. I'm going to go to the police now and file a police report." Katherine testified that after this incident, the girls were crying and asked if the police would come and take Katherine to jail. Katherine explained the videotaping made her feel as though she was "still being controlled . . . being placed under a microscope."

In late summer of 2017, when the parties took the girls to a therapist's office for evaluation, Brandon began filming Katherine in the waiting room.

Katherine testified she felt "trapped" in the office with Brandon as he recorded her.

In October 2018, the parties' parenting coordinator advised Brandon to stop videotaping, as it was an "irritant." Katherine testified that Brandon continued to film her surreptitiously by placing his cell phone in his shirt pocket with the lens facing out. Katherine testified that Brandon finally stopped putting his cell phone in his shirt pocket with the lens facing out after she filed her request for a DVRO.

Brandon testified that he videotaped the early exchanges because he wanted to document the custody exchanges and to show the children were happy and healthy; he also wanted to protect himself from any untrue allegations. Brandon stopped videotaping the exchanges after the parenting coordinator suggested that neither party videotape the interactions. Brandon admitted that now knowing the placement of his cellphone in his pocket so irritated Katherine, it was a "serious judgment error" to continue to do so.

### The October 6, 2021 Incident

On September 30, 2021, in his capacity as an Oakland firefighter, Brandon found a backpack containing two loaded guns in the Oakland Hills. He took it to the fire station and the police were called. Two individuals came by the station demanding their weapons back and threatened the firefighters and their families. In his 18 years as an Oakland firefighter, he had been threatened many times. He took precautionary measures, like changing his license plate and DMV address, but he did not consider it a significant situation.

After learning about the threats, Katherine went to the children's school on October 6, 2021 and attempted to talk to Brandon about her safety

7

concerns for the children. Brandon refused to talk to her and instead videotaped Katherine as she was asking about the welfare of the children.

Brandon testified the children were not in his care when the threat was made. The children came to him four days later. When Katherine showed up at school—which was not her time to have the children—Brandon felt she was trying to use the incident as an opportunity to take the children from him. Brandon's attorney later responded to Katherine by email.

### Alleged Recent Conduct

When asked what Brandon had done recently which disturbed her peace, Katherine mentioned his videotaping, although she could not confirm if he had done so recently: "There have been times when it seemed like he has, but I cannot know for sure." When asked about conduct other than videotaping which disturbed her, Katherine responded: "At transitions, he does not acknowledge my presence in any normal way. During telephone calls, he does not greet me most of the time. Or if he does, it's in a low monotone before he begins to speak in an animated way with the girls. So I feel as though I am a non-presence, unimportant, virtually non-existent entity, and that his only focus is on the children."

### Additional Witness Testimony

Katherine's 18-year-old daughter Elizabeth from a former marriage testified that she overheard Brandon telling Katherine to take her clothes off and "[e]xpose [her] vagina" in a room where the curtains were transparent and did not provide privacy. Elizabeth further testified that Brandon called Katherine "a waste," "a wastrel," "a nothing," "stupid," and a "failure as a mother." She witnessed Brandon screaming at Katherine as loud as he could, which she described as "terrifying."

8

Richard Ferry, a licensed marriage and family therapist specializing in issues related to domestic violence, interviewed Katherine and prepared a "detailed assessment." Katherine told Ferry she felt intimidated by Brandon's rages and described "some sexual abuse and some coerced intercourse she did not want." Ferry did not interview Brandon. Ferry concluded Katherine "did show some of the effects of having been abused in an intimate relationship," but admitted "that doesn't prove [Brandon] abused her. She could have lied and faked it and fooled me." He described Katherine as being "eccentric in the way she arrives at her conclusions," adding, "Her conclusions may be informed by her past history with [Brandon], she may be hypervigilant and may come to a conclusion that makes sense to her but may not make sense to someone who hasn't been through her experiences."

Ferry acknowledged on cross-examination that the risk of problems developing between the parties was reduced because they are no longer living together and their contact is limited to bi-weekly custody exchanges. He explained that "in the aftermath of abuse, all things being equal, the impact on the individual declines. So the effects observed soon after abuse or soon after the termination of an abusive relationship tend to wane over time." Ferry agreed with Brandon's expert, Dr. Robert Kaufman, that "when alcohol abuse or substance use is removed from the picture, then the risk of ongoing or further violence is reduced." Ferry also agreed with Dr. Kaufman that " 'the possibility that this application for a DVRO is something that could facilitate mom's documented interest in moving the children to Santa Barbara,' is something that should be considered."

Brandon called Robert Kaufman, Ph.D., a board certified psychologist with 30 years of experience as a consulting psychologist. He reviewed Ferry's

9

work and was of the opinion it did not qualify as an "assessment." The data Ferry considered was primarily from Katherine, i.e., a "single-source." Ferry also did not adequately explore the role of alcohol in the relationship. Dr. Kaufman opined that "if alcohol was a significant component and influencer during incidents of violence," the cessation of alcohol use by one or both parties could alleviate a risk factor for ongoing violence.

Dr. Kaufman admitted that the "awful incident" of March 23, 2017, during which Brandon screamed obscenities at Katherine could have induced fear in Katherine because Brandon was "out of control." He also noted that after the alleged violent events, the parties were often able to work together cooperatively.

### The Trial Court's Statement of Decision

The court found that Katherine had not met her burden of "showing a past act of abuse within the meaning of the [DVPA] by a preponderance of the evidence." The court explained the factual and legal basis for its decision in a detailed statement of decision.

The court found the recordings of Brandon's rages to be "concerning." It also considered, however, Brandon's testimony that he "was ashamed of his behavior" and that he was "under the influence of alcohol," "under extreme stress from the problems in his and Katherine's relationship," and that he was "overworked and exhausted from work." The court further found that both parties had problems with alcohol during the time they lived together but were now sober—Katherine since December 2016 and Brandon since May 2017.

The court found that Brandon "was advised by many professionals in the child custody case not to videotape the exchanges, yet he continued to do so." It found, however, that "the videotaping of the children during custody

10

exchanges ceased after late 2018 or early 2019. The court noted there "were times that Brandon had a cell phone in his shirt pocket," but "the evidence [was] unclear whether or not he was taping any exchanges."

With respect to the 2021 incident in front of the children's school where Brandon filmed Katherine as she tried to talk to him about the threats made against him at work, the court found that Brandon's "failure to communicate" with Katherine about the potential risk to the children was "insensitive and stretching the bounds of common decency," but found it was not abuse under the DVPA.

As to Katherine's allegations of sexual abuse, the court found that Katherine had not proven the conduct by a preponderance of the evidence. Other than Katherine's testimony, which was simply "not credible," there was no other evidence, oral or documentary, substantiating the allegations.

The court was also troubled by the timing of Katherine's sexual abuse allegations. The alleged misconduct occurred from 2013 to 2017, *five to nine years* before Katherine first raised the issue in a trial brief filed in May 2022. The court noted that Katherine, who had been represented by competent and experienced family law attorneys in the related parentage action, had stipulated in 2019 to a final custody order[4] which provided for joint physical and legal custody of the twins. In 2020, Katherine filed a request for order seeking to have the children spend the school year in Berkeley with Brandon, and summers in Santa Barbara with her. The court found that Katherine's position in the parentage action "calls into question the validity of [her] sexual abuse allegations." The court further noted: "Katherine testified during the hearing that her 'primary goal is that they (the children) be with

---

[4] The stipulation was designated "a final Judicial custody order" pursuant to *Montenegro v. Diaz* (2001) 26 Cal.4th 249.

11

me and be happy in Santa Barbara,' " thus drawing an inference that Katherine's accusations may have been motivated by her desire to modify the custody orders.

Following the issuance of the court's statement of decision, Katherine filed objections thereto.[5] The trial court overruled Katherine's objections. Katherine timely appealed.[6]

## DISCUSSION

Katherine contends the trial court failed to consider the totality of the circumstances and took a limited view of how a victim of domestic violence should act.

### I. Applicable Law and Standard of Review

Under the DVPA (§ 6200 et seq.), a trial court may issue a protective order after notice and a hearing " ' "to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved." ' " (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 225, 228.) The petitioner must prove an "act of past abuse" by a preponderance of the evidence. (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 14.) Abuse includes "plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another" or "engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a)(3), (4).) Enjoined conduct includes threatening, sexually assaulting, harassing, destroying personal property,

---

[5]The nine "objections" essentially asked the trial court reweigh the evidence in Katherine's favor.

[6] On February 26, 2024, we granted the unopposed application of Family Violence Appellate Project for leave to file an amicus brief in support of Katherine.

and disturbing the peace of the other party.  (§ 6320, subd. (a).)  "When determining whether to make any orders under [the DVPA], the court shall consider whether failure to make any of these orders may jeopardize the safety of the petitioner and the children for whom the custody and visitation orders are sought."  (§ 6340, subd. (a)(1))

An order denying a DVRO is reviewed on appeal for abuse of discretion. (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1143.)  "To establish an abuse of discretion, [a party] must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.'  [Citations.]  A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.]  An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice . . . ." ' "  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

In reviewing the evidence, we review the entire record to determine whether there is any substantial evidence to support the findings below. (*Burquet v. Brumbaugh, supra*, 223 Cal.App.4th p. at 1143.)  " ' "We must accept as true all evidence . . . tending to establish the correctness of the trial court's findings . . . , resolving every conflict in favor of the judgment." ' " (*Ibid.*)  We do not determine credibility or reweigh the evidence.  (*Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104, 107.)  If substantial evidence supports the judgment, reversal is not warranted even if facts exist which would support a contrary finding.  (*Ibid.*)

"[W]hen conflicting inferences may be drawn from undisputed facts, the reviewing court must accept the inference drawn by the trier of fact so long as it is reasonable." (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 913; see also *Husain v. California Pacific Bank* (2021) 61

Cal.App.5th 717, 732 [whether a question of fact is decided on conflicting or undisputed facts, that fact question decided against appellant "must be affirmed under the rule of conflicting inferences by which we must indulge all reasonable inferences" in favor of the respondent].) And, as here, " ' "[w]here [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence *or reasonable inferences to be drawn from the facts* will be resolved in support of the determination of the trial court decision." ' " (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94, italics added.)

Also, where, as here, the trial court determines the party with the burden of proof failed to carry that burden, we may reverse the decision only if we determine " 'the evidence compels a finding in favor of the appellant as a matter of law.' " (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 (*Dreyer's*); *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.) Under this standard, a finding is compelled only if the appellant's evidence was ' "(1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Dreyer's* at p. 838.) In connection with the latter point, we note the trier of fact may discredit the testimony of a witness even if it is uncontested. (*LandWatch San Luis Obispo County v. Cambria Community Services Dist.* (2018) 25 Cal.App.5th 638, 643; *Palmieri v. State Personnel Bd.* (2018) 28 Cal.App.5th 845, 857.)

## II. The Trial Court Did Not Abuse its Discretion in Denying Katherine's Request for a DVRO

We consider the allegations of abuse based on sexual assault claims and based on disturbing the peace claims separately. As we explain,

14

Katherine has not shown the trial court abused its discretion on either set of claims.[7]

## A.    *Sexual Assault Claims*

Katherine claims the court erred in finding she had not met her burden of proof in establishing her sexual abuse allegations because she failed to raise her allegations earlier and stipulated to joint legal and physical custody.

The trial court found that Katherine's allegations that Brandon had sexually abused her were not credible.  The court explained the basis for this finding as follows: "It is simply not credible to this Court, that Katherine would have agreed to [joint] custody orders, and agreed to a shared custody arrangement of the parties' children since July of 2017 if these sexual allegations were true."  Katherine attacks the adverse credibility finding by asserting that "the court erroneously imposed on Katherine . . . 'a singular vision of how an abused woman should act.' "

It is commonly understood that " 'women exposed to violence and abuse in their intimate relationships do not respond similarly, contradicting the mistaken assumption that there exists a singular "battered woman profile."

Like other trauma victims, battered women differ in the type and severity of their psychological reactions to violence and abuse, as well as in their strategies for responding to violence and abuse.' "  (*In re I.B.* (2020) 53 Cal.App.5th 133, 155, quoting Dutton, *Understanding Women's Responses to*

_____

[7] Brandon claims Katherine failed to set forth all of the facts in her opening brief; Katherine's appendix fails to comply with the applicable rules of court; and, although he never raised a res judicata defense, the allegations relating to the March 23, 2017 incident and earlier conduct "should have been barred by res judicata."  We elect to address the merits of Katherine's claims and conclude they fail.

*Domestic Violence: A Redefinition of Battered Woman Syndrome* (1993) 21 Hofstra L.Rev. 1191, 1225.) However, we do not understand the trial court's credibility finding to be based upon improper assumptions about how a victim of domestic violence should act. Instead, the court found that taking into account all of the circumstances, Katherine's failure to raise pertinent allegations during protracted custody proceedings in the related parentage action undermined her credibility in the DVRO hearing. This is a finding it was well within its discretion to make.

"It is settled that, 'in a bench trial, the trial court is the "sole judge" of witness credibility. [Citation.] The trial judge may believe or disbelieve uncontradicted witnesses if there is any rational ground for doing so. [Citation.] The fact finder's determination of the veracity of a witness is final. [Citation.] Credibility determinations thus are subject to extremely deferential review. (*La Jolla Casa de Manana v. Hopkins* (1950) 98 Cal.App.2d 339, 345–346 [ "[A] trial judge has an inherent right to disregard the testimony of any witness . . . . The trial judge is the arbiter of the credibility of the witnesses"].)' " (*Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 579.)

There is no evidence that the trial court's assessment of Katherine's credibility was based on an erroneous stereotype about how victims of domestic violence should act. In the statement of decision, the court explained that it evaluated the credibility of the parties and witnesses based on "demeanor, manner of responding to the attorneys' and the Court's questions, body language, facial expressions, consistency of their testimony, [and] bias, among other factors." The court noted that Katherine had not

16

presented any evidence to corroborate her claims of sexual abuse.[8] The court also considered that the alleged incidents of sexual abuse occurred five to nine years prior to Katherine filing her DVRO request.

Katherine asserts that the court placed too much weight on the timing of her sexual abuse allegations given her explanations for the delay. "While absence of a prompt complaint is not a reliable indicator that an alleged sexual assault did not occur, the circumstances surrounding a delayed complaint may be relevant in evaluating the likelihood that the assault occurred." (*Jennifer K. v. Shane K.*, *supra*, 47 Cal.App.5th at p. 585.) Here, Katherine did not raise the sexual assault allegations in her June 2021 petition for a DVRO. Instead, the first time Katherine complained about the alleged incidents was *nearly a year later* in her May 27, 2022 trial brief, which was filed just prior to the contested hearing that commenced on June 6, 2022. Katherine testified: "Sometimes it takes a great deal of time for the worst things to surface and be articulated." She claimed that she did not file the request for the DVRO earlier due to fear that Brandon would be angry, which would make things worse. Brandon strenuously denied the sexual assault allegations. He testified he was unaware that Katherine had accused him of sexual abuse until just prior to the hearing, and believed the recent claims coincided with her hiring of Ferry. The court found Brandon's testimony more credible than that of Katherine.

"As the exclusive judge of the credit and weight to be given to the testimony of a witness, the trier of fact may reject the testimony of a witness

---

[8] We do not mean to suggest that Katherine was *required* to provide corroborating evidence, merely that the lack of corroboration was something the trial court was entitled to consider. (See *In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 118 [DVPA does not contain a corroboration requirement].)

even if, as is certainly not the case here, it is uncontradicted. [Citations.] The trial court was therefore not required to believe appellant's testimony was true and accurate in every respect. ' "In passing on the credibility of witnesses and the weight to be given their testimony, the trier of fact is entitled to consider their interest in the result of the case, their motives, the manner in which they testify, and the contradictions appearing in the evidence." ' " (*Jennifer K. v. Shane K.*, *supra*, 47 Cal.App.5th at p. 579.) That is precisely what the trial court did in this case.

Katherine's reliance on our decision in *Vinson v. Kinsey* (2023) 93 Cal.App.5th 1166, 1175–1180 (*Vinson*) does not further her position. In *Vinson*, we found the trial court had abused its discretion in denying a petitioner's DVRO request based on the fact that she continued to have contact with the party she sought to be restrained. There, petitioner waited approximately seven weeks after the offending conduct to seek a restraining order. (*Id.* at p. 1177.) In reversing, we held the court abused its discretion by narrowly focusing on the timing of the offending incident and failing to consider the totality of the circumstances. (*Id.* at p. 1180.) The court's focus on the timing ignored the "parties' overall history over the course of a decade-long relationship and the difficulty of leaving an abusive relationship." (*Id.* at p. 1177, fn. omitted.)

In *Vinson*, the parties appeared in pro per at a "brief" hearing, in which the court denied petitioner's request by focusing on a single incident. (*Vinson, supra*, 93 Cal.App.5th at p. 1178.) The court ignored petitioner's other claims of physical and mental abuse, which she supported by statements from relatives who witnessed the verbal abuse and saw the resulting injuries and the holes in the wall. (*Ibid.*) We reversed and remanded for a "full consideration" of petitioner's case. (*Id.* at p. 1180.) In

18

doing so, we explained: "This is not to say the court was required to believe any or everything [petitioner] or any other witness said; the evidence was not undisputed, and we cannot say [petitioner] was entitled to the order she sought as a matter of law." (*Ibid.*)

Here, unlike in *Vinson*, the parties were ably represented by counsel at a contested hearing spanning four days, during which the court fully considered Katherine's claims. The court's determination that Katherine failed to establish "reasonable proof of a past act or acts of abuse" was within its exclusive province. (§ 6300, subd. (a); *Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 823.) " 'We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence.' " (*Patricia A. Murray Dental Corp. v. Dentsply International, Inc.* (2018) 19 Cal.App.5th 258, 270.) As noted, the issue before us on appeal is whether Katherine's evidence regarding the sexual assault allegations was ' "(1) ' "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Dreyer's*, *supra*, 218 Cal.App.4th at p. 838.) The answer to both questions is no.

Accordingly, we conclude the trial court did not abuse its discretion in finding Katherine failed to prove the sexual abuse allegations by a preponderance of the evidence.

## B. *Disturbing the Peace Claims*

We next address whether the trial court abused its discretion in not issuing a DVRO based on Katherine's disturbing the peace claims. We conclude she has not shown error.

The phrase " 'disturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or

19

indirectly, including through the use of a third party, and by any method or through any means including, but not limited to, telephone, online accounts, text messages, internet-connected devices, or other electronic technologies. This conduct includes, but is not limited to, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty."  (§ 6320, subd. (c).)

As indicated, a court may issue a DVRO " ' "to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved" upon "reasonable proof of a past act or acts of abuse." [Citation.]  The statute should 'be broadly construed in order to accomplish [its] purpose' of preventing acts of domestic violence." ' " (*In re Marriage of F.M. & M.M.*, *supra*, 65 Cal.App.5th at p. 115.) Nevertheless, "[t]he purpose of a [DVRO] is not to punish past conduct."  (*Id.* at p. 117.)

Here, the court considered whether Brandon's rages—all of which occurred before March 23, 2017—would " 'support a restraining order in this case in 2022.' "  Katherine argues the court's "framing of the issue . . . [was] too narrow, as it fails to consider the totality of the circumstances."  This argument fails for a variety of reasons.  First, the record reflects that the trial court's formulation of the issue was drawn directly from Katherine's attorney's closing argument: "Katherine acknowledged . . . all of Brandon's rages happened before March 23, 2017 . . . and that her counsel stated [during closing argument] that the issue is, 'whether that [conduct] will support a restraining order in this case in 2022.' "  Second, the court correctly referred to the applicable law, noting "the length of time since the most recent act of abuse does not, by itself, control whether a DVPA restraining order should issue.  Instead, the court must consider the 'totality of the

20

circumstances' in deciding whether to grant or deny a petition for relief." (See § 6301, subd. (c).)  Finally, the record reflects the court *did* consider the totality of the circumstances, but it did not find in Katherine's favor.

Although the court found Brandon's "rages" were "concerning," the court did not consider this evidence in a vacuum.  The court also considered Brandon's testimony that he was "ashamed" of his behavior, and that it arose because he was drinking excessively, was exhausted from working too much, and was "under extreme stress" from the relationship problems he had with Katherine.  The court relied on Brandon's testimony that he stopped drinking after separating from Katherine, and Brandon's testimony that the "rages" ceased once the parties separated.

With respect to Katherine's claim that Brandon's post separation videotaping was abusive, the court considered the following circumstances: (1) Brandon testified he believed he was justified in making the videotapings to protect himself against false allegations by Katherine and to show how the children were doing; (2) Brandon continued to videotape the exchanges after being advised by several professionals to stop this conduct; (3) the videotaping of the children during custody exchanges ceased in late 2018 or early 2019; (4) although there were times when Brandon had his cell phone in his shirt pocket during the exchanges, the evidence was unclear whether or not he was taping any exchanges; (5) Katherine admitted she also recorded the children during the custody exchanges because she "felt their voices deserved to be recorded"; (6) Katherine admitted she recorded Brandon prior to their March 23, 2017 separation; (7) Brandon testified that he videotaped Katherine when she arrived at the children's school on October 6, 2021 to talk about the threats against him and other firefighters.  He admitted his failure to communicate with Katherine about the threats was a " 'poor

21

parenting choice' "; (8) Katherine testified she " 'c[ould]not know for sure' " if Brandon had videotaped her and the children since the temporary DVRO was denied; (9) Brandon testified he believed most of the custody exchanges "go well and are peaceful"; (10) Katherine testified that Brandon had not engaged in acts of coercive control: he had not interfered with her financial resources or with her ability to move about freely; he had not placed her under surveillance, monitored her movements or interfered with her ability to communicate; and (11) Finally, the court considered Katherine's testimony that Brandon had allegedly affected Katherine's " 'quiet and peace' " by failing to "acknowledge her presence at transitions in a normal way" or "greet her most of the time during phone calls."

Looking at the totality of all these circumstances, the court concluded the acts and events pled by and testified to by Katherine did not reach the level of "abuse" within the meaning of the DVPA. Substantial evidence supports the court's finding that Katherine failed to prove she was "abused" within the meaning of the DVPA, even if some of the evidence may support a contrary conclusion. Not every act that "upsets the petitioning party" may be deemed destructive of the party's mental or emotional calm to warrant issuance of a DVRO. (*Curcio v. Pels*, *supra*, 47 Cal.App.5th at p. 13.) "The DVPA was not enacted to address all disputes between former couples, or to create an alternative forum for resolution of every dispute between such individuals." (*Ibid.*) Moreover, "[w]hat disturbs the peace of a person differs in each case." (*K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 981.) The trial court's denial of Katherine's application for a DVRO was not an abuse of discretion. (*Jennifer K. v. Shane K.*, *supra*, 47 Cal.App.5th at p. 580.)

Even if we assume that the trial court erred in concluding that Brandon's pre-separation conduct did not "reach the level of 'abuse',"[9] it does not follow that the court's denial of Katherine's request for a DVRO several years after Brandon's "rages" ceased was an abuse of discretion. "A trial court has broad discretion under the DVPA to determine whether to grant a petition for a restraining order." (*M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1143; *In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 702.) The court must consider whether the failure to make any of the requested orders may jeopardize the safety of the petitioner and the children for whom custody or visitation orders are sought. (§ 6340, subd. (a).)

Here, the court acknowledged Brandon's "concerning" behavior, but also considered that the parties had separated, stopped drinking alcohol, and had been, with minor exceptions, successfully coparenting their children for four to five years prior to the DVRO hearing. Under these circumstances, the trial court's conclusion that a DVRO was not required to protect the safety of Katherine or the children is not an abuse of discretion.

## DISPOSITION

The judgment is affirmed. Brandon is entitled to his costs on appeal.

---

[9] During oral argument, Brandon's attorney conceded that some of the pre-separation incidents Katherine testified about (for example, the "rages" in which Brandon screamed insults and profanities, threatened self-harm, and willfully destroyed Katherine's personal property) objectively fell within section 6320's definition of "abuse."

_____
Mayfield, J.*


We concur:


_____
Richman, Acting P.J.


_____
Miller, J.


*Keeler-Hodgetts v. Tsukroff* (A166521)


* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.